1  SPECIAL EDUCATION LAW FIRM, APC
2  Jennifer Guze Campbell (SBN 86818)
3  *Jennifer@selfapc.com*
   Vanessa Jarvis (SBN 201585)
4  *Vanessa@selfapc.com*
5  5206 Montair Avenue
   Lakewood, CA 90712
6  Telephone: (562)735-4111
7  Facsimile (562)490-8663
8
   Attorneys for Plaintiff,
9  I.R., a minor, by her Mother, E.N.

10

11              **UNITED STATES DISTRICT COURT**

12        **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

13

14  I.R., a minor, by her Mother, E.N.,     ) CASE NO. CV 12 9924 - R
                                            )            (VBKx)
15         Plaintiff,                       )
                                            )  **COMPLAINT FOR REVIEW OF**
16         vs.                              )  **SPECIAL EDUCATION DUE**
                                            )  **PROCESS HEARING DECISION**
17                                          )
18  Los Angeles Unified School District     )
                                            )
19         Defendant.                       )
                                            )
20  _____     )

21

22              **INTRODUCTION**

23      1.    Plaintiff I.R. ("Student") by and through her mother, E.N. ("Mother"

24  or "Parent") as next friend and guardian ad litem (collectively, "Plaintiff") files this

25  civil action ("Complaint") against Defendant Los Angeles Unified School District

26  ("District" or "Defendant").

27      2.    Through this Complaint, Plaintiff seeks to appeal the decision of the

28  California Office of Administrative Hearings, Special Education Division ("OAH")

1  in Case Number 2012060029 (the "OAH Decision").  A copy of the OAH Decision
2  is attached hereto as Exhibit A and incorporated herein by this reference.

3       3.    Pursuant to the Individuals with Disabilities Education Improvement
4  Act of 2004 ("IDEA"), any party aggrieved by the findings and decision after an
5  impartial special education due process hearing shall have the right to bring a civil
6  action in any State court of competent jurisdiction or in a district court of the
7  United States, without regard to the amount in controversy.  20 U.S.C.
8  §1415(i)(2)(A).

9       4.    The reviewing court shall receive the records of the administrative
10 proceedings, shall hear additional evidence at the request of a party, and basing its
11 decision upon the preponderance of the evidence, shall grant such relief as the
12 court determines is appropriate.  20 U.S.C. §1415 §(i)(2)(C).

13

14 **APPLICABLE STANDARD OF REVIEW**

15      5.    Under the IDEA, federal courts accord considerably less deference to
16 state administrative proceedings than they do in most instances of "judicial review
17 of ... agency actions, in which courts generally are confined to the administrative
18 record and are held to a highly deferential standard of review." *Anchorage Sch.*
19 *Dist. v. M.P.,* 689 F.3d 1047, 1053 (9th Cir. 2012), citing *E.M. ex rel. E.M. v.*
20 *Pajaro Valley Unified Sch. Dist. Office of Administrative Hearings,* 652 F.3d 999,
21 1005 (9th Cir. 2011) (internal quotation marks omitted).

22     The statute empowers the reviewing court to hear evidence that goes beyond
23 the scope of the administrative record and, based on a preponderance of the
24 evidence, "grant such relief as the court determines is appropriate." 20 U.S.C. §
25 1415(i)(2)(C). "Complete *de novo* review, however, is inappropriate." *Anchorage*
26 *Sch. Dist. v. M.P.,* 689 F.3d 1047, 1053 (9th Cir. 2012), citing *Amanda J. ex rel.*
27 *Annette J. v. Clark Cnty. Sch. Dist.,* 267 F.3d 877, 887 (9th Cir.2001).

28

1    Questions of law are reviewed *de novo*, as are mixed questions of law and

2  fact unless the mixed question is primarily factual. *Anchorage Sch. Dist. v. M.P.,*

3  689 F.3d 1047, 1053 (9th Cir. 2012), citing *N.B. v. Hellgate Elementary Sch. Dist.,*

4  541 F.3d 1202, 1207 (9th Cir.2008).

5

6                              **PARTIES**

7      6.    Plaintiff was at the times mentioned in this Complaint, a resident of

8  the County of Los Angeles, California.

9      7.    E.N. is Student's mother and lives with Student.  The full name of

10  E.N. is known to Defendant and appears in the Application for Appointment of

11  Guardian ad Litem.

12     8.    I.R. is currently in a student in a general education classroom at

13  Heliotrope Elementary School within the Los Angeles Unified School District.

14     9.    Defendant Los Angeles Unified School District is a governmental

15  agency organized and existing under the laws of the State of California.  Defendant

16  maintains its principal place of business in Los Angeles, California, within the

17  boundaries of Los Angeles County.

18

19                            **JURISDICTION**

20     10.   This action arises under the laws of the United States.  Jurisdiction is

21  conferred on this Court pursuant to 28 U.S.C. §1331.

22     11.   Venue is proper in this Court under 28 U.S.C. §1391(b).  Student and

23  Mother each reside in the Central District of California, Western Division, and

24  Defendant is located in, and does business in, the Central District of California,

25  Western Division.  All of the events that are the subject of this Complaint took

26  place in the Central District of California, Western Division.

27

28

1     12.    Administrative remedies under the Individuals with Disabilities

2  Education Improvement Act of 2004 ("IDEA") have been exhausted.  See the

3  OAH Decision attached hereto as Exhibit A.

4

5                       **FACTS**

6     13.    Student is a child with a disability within the meaning of the IDEA.

7  Defendant determined Student to be eligible for special education services from

8  District in August of 2006.  Student qualifies for services under the IDEA (20

9  U.S.C. § 1400 et seq.), under the category of "autistic-like behaviors."  Defendant

10  is required to provide Student with a free appropriate public education ("FAPE") as

11  defined in 20 U.S.C. §1401(9).

12     14.    Throughout the times relevant to Plaintiff's request for due process

13  hearing filed with OAH ("Due Process Complaint"), Defendant offered Student

14  placement in a special day class ("SDC").  Parent did not believe that an SDC as

15  provided by District was appropriate for Student, and did not consent to the

16  placement.  Because Defendant did not have consent to place Student in an SDC,

17  Defendant implemented "stay put" for Student, i.e., the last placement to which

18  Parent consented, general education, remained Student's placement.  Defendant

19  also provided Plaintiff with a full-time, but unqualified, aide.

20     15.    Parent wished to have Student kept in a general education classroom,

21  but with a qualified aide, an aide knowledgeable in behavior modification

22  techniques appropriate for children with autism.

23     16.    Defendant contended that even with an aide, a general education

24  classroom was not appropriate for Student, and maintained its position that an SDC

25  classroom was necessary to provide Student a FAPE.  Defendant did not believe

26  that Student was receiving a FAPE in the general education program with an aide,

27  yet Defendant did not initiate a request for due process hearing for the authority to

28  implement Defendant's individualized education programs ("IEPs") for Student

1  over Parent's objections.  Defendant thus acquiesced to Student not receiving a

2  FAPE for two academic years.

3      17.    Plaintiff filed a Due Process Complaint against Defendant on May 29,

4  2012, asserting therein claims that Defendant denied Student a FAPE during the

5  2010/2011 and 2011/2012 academic years due to Defendant's failure to provide

6  Student with an appropriate placement.  Plaintiff argued that the existing

7  placement of Student in a general education classroom with an untrained aide was

8  a denial of FAPE, and advocated for a change in placement to a non-public school

9  ("NPS").

10     18.    A hearing was held in OAH Case No. 2012060029 on August 22, 23,

11  27, 28 and 29, 2012.  The OAH issued the OAH Decision on October 10, 2012,

12  ruling that District prevailed on issues 1 though 10, and that Student prevailed on

13  issue 11, related to Defendant's failure to provide Student with prior written notice

14  in response to her request for a change in placement.

15     19.    On the issue of whether Defendant denied Student a FAPE due to

16  placement was decided in Defendant's favor.  The administrative law judge

17  ("ALJ") ruled that Defendant failed to provide Student a FAPE, but ruled in

18  Defendant's favor since Defendant offered a FAPE, but was unable to implement it

19  due to Parent's objections. (OAH Decision page 54 ¶35).

20

21          **FIRST CAUSE OF ACTION**

22    **Review of Special Education Due Process Hearing Decision**

23

24          **ISSUE PRESENTED FOR REVIEW**

25 20. Whether the Office of Administrative Hearings ("OAH") erred in finding

26  Defendant met its obligations to Student under the IDEA and California's

27  Education Code when Defendant offered, but failed to provide, a free appropriate

28  public education ("FAPE") to Student.

# DISCUSSION

21.   Plaintiff seeks review of the ALJ's decision as to Plaintiff's issues one and seven, as stated in Plaintiff's Due Process Complaint and in the OAH Decision. Issues one and seven concern Plaintiff's contention that Student was denied a FAPE during the 2010/2011 and 2011/2012 school years because Defendant did not provide Student with an appropriate placement.

22.   At Student's November 9, 2010 IEP meeting, Defendant offered Plaintiff placement in an early education special day class ("SDC"). Parent wished Plaintiff to be placed in a general education class and did not consent to the SDC, but consented to the related services. As a result of Parent's lack of consent to the SDC placement, Student remained in her previous placement, a general education classroom with a full-time aide. (OAH Decision page 52, ¶29).

23.   At Student's March 1, 2011 IEP meeting, Defendant again offered Student placement in an early education SDC, and Parent again rejected the SDC but consented to the related services. Parent similarly rejected offers for Student to be placed in an SDC at subsequent IEP meetings held in April 2011, May 2011, June 2011 and October 2011. (OAH Decision page 52, ¶30).

24.   The ALJ, Clifford H. Woosley, noted in the OAH Decision that six different defense witnesses testified at the OAH hearing that Student's placement in a general education classroom during the 2010/2011 and 2011/2012 academic years was not an appropriate full-time placement for Student. (OAH Decision page 43, ¶217).

25.   The ALJ found that Defendant acknowledged that the general education classroom placement (in which Student was placed for the 2010/2011 and 2011/2012 academic years) was inappropriate for Student, and therefore, Defendant failed to provide a FAPE to Student. (OAH Decision page 46, ¶2).

26.   Despite the ALJ's finding, on page 46 of the OAH Decision, that Defendant failed to provide a FAPE to Student, the ALJ determined, on page 50 of

1  the OAH Decision, that "Student failed to meet her burden of proof that District
2  failed to provide Student with a FAPE." (OAH Decision page 50, ¶21).

3      27.    The ALJ determined that Defendant offered Student an appropriate
4  placement, but that "Mother's refusal to consent prevented District from
5  implementing and providing a FAPE". (OAH Decision page 46, ¶2).

6      28.    The ALJ made clear that, in his opinion, the focus on determining
7  whether Student was denied a FAPE should be on whether Defendant's proposed
8  program was adequate, not on whether Defendant *actually provided* a FAPE to
9  Student, relying on a Ninth Circuit Court of Appeals case which applied law from
10 the State of Washington (*Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307 (9th
11 Cir. 1987)).  (OAH Decision page 51, ¶21).

12     29.    The ALJ demonstrated his awareness of California's Education Code
13 56346(f) which requires a school district to initiate a due process hearing if the
14 school district determines that the component of the IEP to which parent does not
15 consent is necessary to provide a FAPE to the child, by citing it within his
16 decision. (OAH Decision page 50, ¶20).

17     30.    The ALJ apparently did not find that Defendant was bound by
18 California's Education Code 56346(f) which requires Defendant to file a due
19 process complaint to enforce its offer of FAPE to Student.  The ALJ cited no legal
20 authority for his finding that Defendant was not bound by California Education
21 Code 56346(f), or for failing to hold Defendant responsible for having violated it.

22     31.    The ALJ made clear that, in his opinion, Parent relieved Defendant of
23 Defendant's duty to provide Student a FAPE, stating, "The only reason District
24 could not fully implement the FAPE was because Mother did not consent.  District
25 offered a FAPE for both the 2010-2011 and 2011-2012 school years." (OAH
26 Decision page 54, ¶35).

27
28

1  32. The ALJ's ruling that Defendant was excused from providing a FAPE
2 because of Parent's lack of cooperation is not consistent with the law in the Ninth
3 Circuit.

4  33. The burden for substantive compliance with the IDEA cannot be
5 shifted from the District to the parents. Nothing in the IDEA makes Defendant's
6 duty to provide Student a FAPE contingent on parent's cooperation with the
7 Defendant's preferred course of action. *Anchorage Sch. Dist. v. M.P.*, 689 F.3d
8 1047, 1055 (9th Cir. 2012). School districts cannot excuse their failure to satisfy
9 the IDEA's procedural requirements by blaming parents. *W.G. v. Bd. of Trustees*
10 *of Target Range Sch. Dist. No. 23, Missoula, Mont.,* 960 F.2d 1479, 1485 (9th Cir.
11 1992).

12  34. It is not sufficient that a school district simply *offer* a FAPE to a
13 student, rather the school district must actually *provide* a FAPE. The Supreme
14 Court has held that a school district satisfies its requirement to provide FAPE to a
15 handicapped child by "providing personalized instruction with sufficient support
16 services to permit the child to benefit educationally from that instruction…at
17 public expense." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester*
18 *County v. Rowley*, 458 U.S. 176, 203, 102 S. Ct. 3034, 3049, 73 L. Ed. 2d 690
19 (1982).

20  35. The ALJ, in his decision, analyzes only whether Defendant offered a
21 FAPE, and excuses Defendant's failure to provide a FAPE to Student by blaming
22 Parent. Since the ALJ determined Parent was to blame for Defendant's failure to
23 provide a FAPE, the ALJ ruled in favor of Defendant, and offered Plaintiff no
24 remedy for the denial of FAPE.

25  36. California Education Code 56346(f) makes clear that a school district
26 may not sit on its hands and knowingly fail to provide a FAPE because a parent
27 has refused to consent to a special education program component. California
28 Education Code 56346(f) provides that a school district must initiate a due process

1  hearing if it determines that the proposed special education component to which
2  the parent does not consent is necessary to provide a FAPE to the child.

3      37.    The case of *Gregory K. v. Longview School District* (9th Cir. 1987)
4  811 F.2d 1307, on which the ALJ relies on for the proposition that a school district
5  must only *offer* a FAPE, was a Washington state case and thus did not involve
6  application of California Education Code 56346(f).  (OAH Decision page 49, ¶14).
7  The ALJ thus erred in relying on the *Gregory K.* case for the standard of denial of
8  FAPE in the underlying OAH matter.

9      38.    Defendant had a duty to provide a FAPE to Student during 2010-2011
10  and 2011-2012 academic years.  The ALJ found that Defendant failed to provide a
11  FAPE. (OAH Decision page 45 ¶2).  Having found that Defendant failed to
12  provide a FAPE to Student, the ALJ was required to rule in favor of Plaintiff and to
13  provide remedies.  The ALJ erred when he excused the District's failure to provide
14  a FAPE by blaming Parent.

15      39.    By characterizing the 3.9 million handicapped children who were
16  "served" as children who were "receiving an appropriate education," the Senate
17  and House Reports unmistakably disclose Congress' perception of the type of
18  education required by the [IDEA] Act: an "appropriate education" is provided
19  when personalized educational services are provided.  *Bd. of Educ. of Hendrick*
20  *Hudson Cent. Sch. Dist., Westchester County v. Rowley*, 458 U.S. 176, 196-97, 102
21  S. Ct. 3034, 3046, 73 L. Ed. 2d 690 (1982).

22      40.    It is clear that in order to comply with the IDEA, a school district
23  must *provide*, not just offer, a FAPE.  Accordingly, the OAH Decision should be
24  reversed.

25
26                        **PRAYER FOR RELIEF**
27      41.    WHEREFORE, Plaintiff respectfully requests that this Court:
28

a.  Reverse the Decision of the Office of Administrative Hearings as to issues one and seven;

b.  Order District to place Student at the NPS known as The Help Group in Sherman Oaks, California, for a period of two years;

c.  Order District to fund an extra year of schooling for Student;

d.  Order District to convene an IEP team meeting within 30 days of this Court's order to establish new goals and objectives for Student;

e.  Order District to provide 300 hours of behavioral intervention services in the form of applied behavior analysis ("ABA") from a non-public agency ("NPA") of Mother's choosing at Student's home over the period of one year;

f.  Order District to provide 100 hours of speech and language services from an NPA of Mother's choosing over a period of one year;

g.  Order District to provide 70 hours of occupational therapy services from an NPA of Mother's choosing over a period of one year;

h.  Order District to provide timely transportation for Student from home to school and school to home;

i.  Order District to provide 100 hours of counseling for Student from an NPA of Mother's choosing at Student's school over the period of one year;

j.  Order District to provide 100 hours from an NPA of behavior intervention development ("BID") supervisor services at Student's school to facilitate the training of behavioral intervention strategies for Student;

k.  Order District to provide 80 hours of behavioral specialist time, from an NPA of Mother's choice, to facilitate social interaction for Student with her peers at recesses over the period of one school year;

1   l. Order District to convene an IEP team meeting within 30 days of this
2     Court's order to establish goals for social interaction for Student;
3   m. Order District to provide Student with one-to-one tutoring by a
4     credentialed teacher from an NPA of Mother's choice for 200 hours;
5   n. Rule that Plaintiff is the prevailing party; and
6   o. Award Plaintiff's costs, disbursements and reasonable attorneys' fees
7     in both the underlying administrative matter and this proceeding.

8

9         Special Education Law Firm, APC

10

11

12 Dated: November 16, 2012

13        Jennifer Guze Campbell, Esq.
14        Vanessa Jarvis, Esq.
         Attorneys for I.R., a minor, by her Mother,
15        E.N.

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit "A"

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of:<br><br>PARENTS ON BEHALF OF STUDENT,<br><br>v.<br><br>LOS ANGELES UNIFIED SCHOOL DISTRICT. | OAH CASE NO. 2012060029 |

## DECISION

The due process hearing in this matter proceeded on August 22, 23, 27, 28 and 29, 2012, in Van Nuys, California, before Administrative Law Judge (ALJ) Clifford H. Woosley, from the Office of Administrative Hearings (OAH). Attorney Vanessa Jarvis of Special Education Law Firm (SELF) appeared on behalf of Student. Student's Mother and paralegal James Wiley Campbell were present throughout the hearing. Student's Father attended portions of most days and Student attended the first day of hearing. Attorney Susan B. Winkelman of Fagen Friedman & Fulfrost, LLP, appeared on behalf of Los Angeles Unified School District (District). Zachary Bushnell attended the hearing for District.

On May 29, 2012, Student filed a Request for Due Process Hearing (complaint). On July 18, 2012, OAH granted a continuance of the due process hearing, for good cause, pursuant to District's request. On August 29, 2012, at the close of hearing, the parties were granted permission to file written closing arguments by September 17, 2012. On September 14, 2012, Student requested and was granted a two-day continuance for final briefing. On September 19, 2012, upon receipt of the written closing arguments, the record was closed and the matter submitted.

## ISSUES

1.      Did District deny Student a free appropriate public education (FAPE) from September 2010 to June 2011 (the 2010-2011 school year), by failing to provide Student with an appropriate placement?

2.      Did District deny Student a FAPE during the 2010-2011 school year by failing

to provide Student with transportation services and, procedurally, impeding Mother's right to participate in the individualized education program (IEP) team process regarding transportation?

3.      Did District deny Student a FAPE from September 2010 to November 2010 by failing to provide Student with special education services (related to an adult aide, transportation, and goals) and, procedurally, impeding Mother's right to participate in the IEP team process by unilaterally authorizing resources for Student outside the IEP team process?

4.      Did District deny Student a FAPE from November 2010 to June 2011 by predetermining Student's placement at the November 2010 IEP team meeting?

5.      Did District deny Student a FAPE from September 2010 to March 2011 by failing to provide a qualified adult assistant as part of District's formal offer of FAPE at the October and November 2010 IEPs?

6.      Did District deny Student a FAPE from March 2011 to June 2011 by predetermining the provision of behavior intervention development (BID) services at the March 2011 IEP team meeting?

7.      Did District deny Student a FAPE from September 2011 to May 2012 (2011-2012 school year) by failing to provide Student with an appropriate placement?

8.      Did District deny Student a FAPE for the 2011-2012 school year by failing to determine present levels of performance and new goals, at Student's June 14, 2011 IEP team meeting, before District made its offer of FAPE to Student?

9.      Did District deny Student a FAPE for the 2011-2012 school year by failing to provide transportation service to Student?

10.      Did District deny Student a FAPE by failing to timely provide an assessment plan, as District represented, in response to Mother's request for a change in placement at the February 2012 IEP meeting?

11.      Did District deny Student a FAPE from February 2012 to May 2012 by failing to provide prior written notice to Student regarding Student's request for a non-public school (NPS) at the February 2012 IEP team meeting?

FACTUAL FINDINGS

1.      Student is a nine-year-old, fourth-grade girl attending District's Heliotrope Elementary School (Heliotrope) and is eligible for special education placement and related

2

services as a student with autistic-like behaviors. District initially assessed and found Student eligible when she was three years old, at an August 2006 individualized education program meeting (IEP). However, she did not attend a District school until she enrolled at Heliotrope for her second grade, in September 2010.

2.      Mother testified that when Student was three years old, she became increasingly concerned about her inability to speak well. Student would not respond when called, often requiring Mother to repeat her requests or physically approach Student. Student's pediatrician suspected speech delays and autism. The doctor advised Mother to have her school district assess Student and conduct an IEP. On August 7, 2006, Mother contacted District, which conducted psychoeducational and speech and language assessments.

3.      On August 31, 2006, District convened Student's initial IEP team meeting. Attending were: Mother; the District administrator and school psychologist, Marilyn Alonso; the special education (SE) teacher, Fatima Fierro; and general education teacher, Jill Thomas. The IEP team reviewed the District's assessments and Student's present levels of performance (PLOPs) in the areas of health, cognition, school readiness, social emotional, adaptive skills, motor abilities, and speech and language. The IEP noted that Student had no preschool experience and had been home with parent. The IEP team determined that Student was eligible for special education services as a child with autistic-like behaviors. Student could also have been eligible as a child with a language or speech disorder, because of Student's moderate receptive and expressive language delay and deficits in social interaction which affected her oral language and reciprocal communication.

4.      The IEP team concluded that Student's delays in language and social emotional development impacted Student's ability to meet District grade level standards. The IEP team developed goals and objectives for Student in the areas of pragmatics (speech and language), school readiness, and social emotional (peer interaction). The team discussed the full range of placement options, including Head Start, District's preschool collaborative class, and District's special day classes (SDC). The IEP found that Student required a small, structured, language-based program. The District's offer of a free and appropriate public education (FAPE) in the least restrictive environment (LRE) for the 2006-2007 school year was: placement in the preschool mixed class at Chandler Elementary School; 30 minutes a week of speech and language services; transportation, because Chandler was not Student's school of residence; and extended school year (ESY). Student would participate in District's general education curriculum, with accommodations, 80 percent of her time per week in special education.

5.      Mother did not consent to the District's offer of placement and services. Mother testified that she wanted Student in a general education setting with a one-on-one aide. She was concerned that Student would pick up on the negative behaviors of other SDC students. Mother also believed that Student's fine and gross motor skills needed to be

3

addressed. She had difficulty holding scissors and pens, would regularly walk on her toes, and trouble kicking a ball. Student was, however, able to walk and ambulate on her own.

6.      Mother did not enroll Student in the District. Instead she enrolled Student at La Canada Preschool, a private school, for about one and a half years. Student then attended Teach2Talk Academy, a private school with an early intervention program and academics for students with autism, for a year. For first grade, 2009-2010, Student attended BEST (Bunt Early Specialized Teaching) Kids Classes in La Canada, which was a private school founded by Stephanie Bunt in 2008.

7.      Ms. Bunt testified at the hearing. She earned a bachelor of arts in psychology, with a minor in applied developmental psychology, in 2003, and a master of arts in education, in 2007, from the University of California in Los Angeles (UCLA). She is completing her dissertation for a doctorate in psychological studies in education. Ms. Bunt is not a credentialed general or special education teacher. She does not hold any other credentials or certifications.

8.      While attending UCLA, she participated in observational learning and research with Dr. O. Ivar Lovaas, an early proponent of applied behavioral analysis (ABA) for the treatment of children with autism, developing a behavioral intervention methodology, often referred to as the Lovaas model.  She testified that she was also Dr. Lovaas' personal assistant for five years.

9.      Ms. Bunt states that she is a behavioral specialist, which she defined as someone who has been trained in ABA for several years by a teacher with a masters or doctorate degree or similar ABA training and experience. Ms. Bunt defined ABA as an analysis of different types of behaviors, which are evaluated, adjusted, and reinforced to help a child improve behavior and the ability to learn in the classroom by, for example, increasing the child's concentration. Ms. Bunt has been a speaker on the topic of ABA and autism at UCLA, California State University - Los Angeles, and at numerous conferences.

10.     She has been a consultant, therapist, and supervisor for Children with Autism since 2002, where she used ABA methods to mainstream 17 children into a typical classroom setting. Ms. Bunt states that she has had significant success with autistic children. Overall, she testified that she has mainstreamed between 25 to 27 autistic children into general education classrooms.

11.     Ms. Bunt said that, in relation to Children with Autism, she was a consultant for Pasadena Unified School District, La Canada Unified School District, and District. She developed special education programs for the Pasadena, Glendale, and La Canada school districts, as well as District. Since 2002, District has hired her to train staff regarding autistic children. Ms. Bunt testified that she has worked with behavioral specialists and behavior intervention developers, and has trained District school staff in ABA methods. She has provided similar consulting services to the local regional centers. She testified that she has

4

trained approximately 50 one-on-one aides since 2002, for various school districts, including District.

12.     Ms. Bunt stated that an aide who works one-on-one with an autistic child in the classroom needed to possess a bachelor degree, as well as be certified by the Behavior Analyst Certification Board (BACB) or have several years of training under a behavioral specialist, who possesses a masters or doctorate degree in behavioral analysis. In Ms. Bunt's opinion, a one-on-one aide who works with an autistic child in a classroom needs to be a behavioral specialist.

13.     Ms. Bunt founded BEST Kids Classes in 2008. Her curriculum vitae, which was submitted as evidence, states that BEST designs, trains, and implements children's classes related to foreign languages, phonics, math, drama, art, yoga, after-school programs, and individualized tutoring programing. The school is not certified as a California nonpublic school. In response to questioning, Ms. Bunt was unable to clearly describe the structure, schedule, and curriculum used at BEST for Student.

14.     Parents retained Ms. Bunt to work with Student in 2006. Upon BEST's founding in 2008, Student attended sessions at the school. Ms. Bunt utilized ABA, Floortime, and discreet trial therapy (DTT), which is a method of ABA. She developed educational programing for Student with a BEST behavior specialist who would work with Student in private sessions in a BEST classroom setting.

15.     Ms. Bunt stated that Student participated in a first grade, general education class of about 20 pupils, with a one-on-one behavioral specialist, a classroom adult aide, and the teacher. Student's teacher was not credentialed in general or special education. Student was the only special needs pupil in the class. Ms. Bunt said that she used a first grade curriculum for Student which was based on standards she learned at UCLA. She acknowledged that she did not use the California State Board of Education core standards, curriculum guidelines, instructional materials, or standardized tests. She did not use a reading curriculum, like District's Open Court Reading (OCR) program, which regularly measured a pupil's level of performance. Student did not receive a grade report.

16.     Student's BEST first grade class met four times a week, on weekday afternoons and on the weekend. Ms. Bunt explained that the typically developing, general education pupils attended school on the weekdays and would come to the BEST class later, in the afternoon or on the weekend. Ms. Bunt called the class an "after school program." Her testimony was unclear as to what the general education pupils were taught in the BEST class, since she said the general education pupils were attending school elsewhere. Ms. Bunt did not indicate whether the Student's BEST first grade class were all first graders, pursuing the same curriculum. Generally, Ms. Bunt's description of Student's first grade class at BEST did not comport with a typical, public, general education classroom at District.

17.     During her first grade year, Student also attended two or three one-on-one sessions on weekday mornings. Ms. Bunt did not state whether these sessions addressed

5

behavior or academics. On some days, Student would remain at BEST after her morning session and attend her afternoon class.

18.     Ms. Bunt testified that Student was performing academically at grade level in math, writing, and reading when she enrolled at District in September 2010.  She did not produce, reference, or administer any state or generally recognized standardized tests which measured Student's grade level performance.  She did not produce report cards, curriculum test results, or work samples.[1]  Ms. Bunt based her opinion on her work with Student.

19.     Mother stated that Student's strengths in the BEST general education classroom were her willingness to learn and be creative.  Student's stubbornness could be used in a positive manner.  Student was a happy girl, engaging with other children.  Mother believed that Student was at the same academic level as the typically developing BEST first grade pupils.

20.     Mother said that Student had no issues regarding violent or bad behavior at BEST.  Ms. Bunt reported that Student's behaviors were under control at BEST.  She said Student did not have a problem with hitting and had never struck Ms. Bunt.

21.     Mother enrolled Student in District for second grade at Heliotrope in September 2010, a week before school started.  At the time of enrollment, Mother stated she provided the female office clerk, at Heliotrope, a written note for the school principal stating that Student required a one-on-one aide because Student had attention problems, needed redirection in class (and at home), would "drift off," had self-stimulatory (a.k.a. "stimming") tendencies, and would occasionally wander off.[2]  Mother wanted to make sure there was someone there to keep track of Student.  Mother said she also provided a copy of the 2006 IEP.

22.     Heliotrope was the Student's District school of residence, also referred to as Student's home school.  Mother and Student lived less than four city blocks, or about a quarter of a mile, from Heliotrope.

23.     On the Student's first day of school, September 13, 2010, Mother met with and provided Ms. Eisner a letter requesting formal assessment and evaluation for special

---

[1] At hearing, Student did not provide documentation from the schools she attended from the 2006 IEP to September 2010, when she enrolled at District.  District claimed it needed the school records for evaluating Student and that, when it tried to obtain the school records based upon the information provided by Mother, it could not.  Student claimed that District did not properly pursue the records.

[2] This note was addressed to Rosemarie Eisner, who Mother mistakenly identified as the Heliotrope principal.  Ms. Eisner was Heliotrope's Assistant Principal, Elementary Instructional Specialist (AP-EIS).

education placement and services.  The District generated the assessment plan and Mother signed.

24.     Mother also told Ms. Eisner about her concerns relative to Student's safety at school.  Mother said that Student had a tendency to walk away and would occasionally engage in self-injurious behavior, such as banging her head and knees.  Mother said that Student was not aware of dangers in her surroundings and that she wanted an adult assistant to be with Student during the day.  Ms. Eisner arranged for an adult assistant to be with Student until Student's needs for supervision could be determined.

25.     By letter dated September 22, 2010, attorney Jennifer Guze Campbell informed Heliotrope's principal, Lorena Avalos, that SELF was representing Mother and providing legal counsel with respect to Student's special education matters.  Ms. Campbell then stated Mother consented to the following portions of the August 2006 IEP: (1) speech and language services, (2) transportation, and (3) extended school year.  Mother did not consent to the following portions of the 2006 IEP: (1) goals and objectives, and (2) special day program placement.[3]

26.     By a second letter to Principal Avalos, also dated September 22, 2012, Ms. Campbell referred to Mother's September 13, 2010 letter to Ms. Eisner, attaching a copy. Mother requested academic, social/emotional, behavioral, and occupational therapy (OT) assessments, to be followed by an IEP as soon as possible.  Ms. Campbell stated that they expected an IEP to take place within 30 days of Mother's letter to update Student's IEP plan, to be followed by another IEP within 60 days of Mother's letter, to discuss the anticipated assessments' results.  Ms. Campbell requested copies of any documents to be introduced at the IEP to be submitted five days before.  Ms. Campbell put the District on notice that an attorney and/or advocate from SELF would attend all IEP meetings and other proceedings. She estimated the IEP meetings to take three hours, if all documents were provided before the meeting; if not, the meetings would take six hours.  Ms. Campbell demanded that all communication regarding Student's special education be directed to SELF, not Mother, and that SELF expected strict adherence to the communication protocol.

27.     By letter of September 24, 2010, Heliotrope Principal Lorena Avalos responded to the September 22, 2010 correspondence from SELF.  She stated that the District would not implement those portions of the 2006 IEP to which Mother consented, because it appeared that there may have been some intervening placements and/or IEPs.  Ms. Avalos noted that the enrollment form, completed by Mother, indicated that Student may have last attended school in the La Canada Unified School District, as well as private school. District had requested Student's documents from La Canada USD and was otherwise attempting to obtain Student's prior records.  Ms. Avalos specifically requested that SELF

---

[3] Whenever SELF wrote a letter to Heliotrope, it would send a copy to Patrick Balucan, Assistant General Counsel, Office of General Counsel, for District.

7

provide any insight and information they may have regarding Student's prior placement, which would expedite the process.

28.     Ms. Avalos stated that District would provide Student with a 30-day administrative placement, which would be followed by an IEP, noting that Mother had signed the assessment plan on September 13, 2010. She also stated that SELF's request for records and assessments in District's possession were being sent pursuant to the District's obligations.

29.     Student started the 2010-2011 school year in the second grade general education class of teacher Erica Valles. Ms. Valles testified at the hearing. She had been a District teacher for about seven years and, at the time of the hearing, was teaching fourth grade. She earned a bachelor of arts in urban learning and a California teaching credential (K through 8) in 2004, and a master's in education and a California reading specialist credential in 2007, from California State University, Los Angeles.

30.     While in Ms. Valles' class, Student had a one-on-one, special education aide, Ms. Beatriz Reymundo. When Student started, Ms. Valles knew that Student was a special education pupil, with autism. Ms. Valles previously had two autism students in her general education class. Ms. Valles believed that her class was Student's first, formal school setting. She estimated Student's general academic level as kindergarten.

*October 13, 2010 IEP*

31.     On October 13, 2010, District convened an IEP team meeting. Attending were: Mother; Father; SELF Advocate, J. Wiley Campbell; SELF IEP Advocate, Jim Campbell; AP-EIS and administrator, Ms. Eisner; newly assigned AP-EIS, Patricia Choe; general education teacher, Ms.Valles; SE teacher, Barry Jetton; District school psychologist, Luz Peña-Rivera; language and speech (LAS) specialist, Brenda Coulter; and District attorney, Ms. Winkelman.

32.     The PLOP for health indicated that Student's hearing was normal in both ears and that vision was normal. She had no allergies or hospitalizations. Though health did not impact Student's participation in the educational program, the IEP noted that Mother reported that Student needed a gluten free diet and no dairy, eggs, or sugar.

33.     The District assessments were not completed for the 30-day IEP. Therefore, the PLOPs for cognition, social-emotional functioning, and language function restated the findings of the initial psycho-educational report conducted on August 21, 2006. No goals and objectives were developed, pending the assessment reports' completion.

34.     Having had Student in her class for a month, Ms. Valles reported reading assessment data. The District's reading OCR program regularly measured a pupil's performance. Student scored at a deficit, possibly at kindergarten or early first grade in her

8

performance. Ms. Valles reported that Student's math appeared to be grade level, except for word problems.

35.     Ms. Valles stated that Student had tantrums and, at times, refused to work. Student did not seek out other children for socialization. Student's advocate asked that a District provide Student a socialization program. The school psychologist, Ms. Peña-Rivera, stated that the assessments had not been completed but that District would offer, in the interim, a socialization program outside the IEP format.

36.     The speech and language specialist, Ms. Coulter, reported that Student appeared to have good vocabulary and spoke in complete sentences. However, she needed to complete her formal assessment to determine Student's LAS needs. The District did not offer LAS services at that time, pending completion of the LAS assessment.

37.     The IEP team agreed Student continued to meet the eligibility of autism. The District did not offer placement and related services, but agreed that Student would remain in the general education classroom until the next IEP, which would review the completed assessments. The District proposed interim accommodations for Student's attention deficits, which included redirection, preferred seating, breaks, visual and verbal prompts, light touch on the shoulder to redirect, as well as shortened assignments for classwork and homework. Also, interim accommodations for Student's deficits in reading, writing, and memory would be repetition and clarification. District's offer indicated that Student's resistant to math work problems and her LAS deficits could not be addressed but would have to be determined after completion of the assessments.

38.     At the conclusion of the meeting, the Parents did not sign the IEP. The SELF advocates recorded the IEP, which took three hours, including breaks. The transcription of the audio is 57 pages in length.

39.     By letter dated November 8, 2010, Ms. Campbell wrote Ms. Choe, who was the newly assigned AP-EIS for Heliotrope, stating that Mother consented to the following portions of the October 13, 2010 IEP: (1) temporary full-time aide until Student's supervision needs are properly assessed; (2) classroom modifications and accommodations; and (3) placement general education instructional setting. Mother did not consent to the following portions of the IEP: District's failure to (1) provide goals and objectives, though the IEP team identified multiple areas of deficiency; (2) provide any services, despite identified areas of deficiencies; and (3) give LAS services, using Student's 2006 IEP. Ms. Campbell reserved all rights regarding the October 2010 IEP.

*Psychoeducational Comprehensive Reevaluation*

40.     Ms. Peña-Rivera completed the psychoeducational comprehensive re-evaluation of Student, producing a report dated November 2, 2010. She testified at the hearing. She had been a school psychologist with the District for 13 years. Previously, she was a mentor for high school and college students. Her duties and responsibilities included

9

conducting psychoeducational evaluations, attending IEP meetings, and providing DIS counseling. Ms. Peña-Rivera received a bachelor's degree in psychology and Spanish in 1995 and a master's in psychology in 1999, from San Diego State University. With her masters, she received her pupil personnel services (PPS) credential, which authorizes her to conduct assessments and service students from kindergarten through 12th grades.

41.    Ms. Peña-Rivera noted that Student had been evaluated in 2006, when her initial IEP found her eligible as having autistic-like behaviors. The initial offer of placement was in a special day preschool program with speech and language services. However, parent did not consent to the placement and services.

42.    The purpose of the psychoeducational reassessment was to reevaluate Student's special education eligibility. Student was seven years, seven months old at the time of evaluation. Ms. Peña-Rivera sought to determine Student's learning strengths and weaknesses, determine whether Student had a learning disability in reading, writing and math, and determine if Student exhibited characteristics associated with autism. The reassessment would recommend an appropriate placement and program for Student, recommend supportive educations strategies, and generally assist the IEP team in evaluating Student's eligibility and need for SE services.

43.    Ms. Peña-Rivera utilized the following tests and procedures: Cognitive Assessment Scales (CAS); Comprehensive Test of Phonological Processing (C-TOPP); Wide Range Assessment of Memory and Learning (WRAML); Behavior Assessment Scale for Children, Second Edition (BASC-II), Parent Report; BASC-II, Teacher Report; Gilliam Autism Rating Scale-Second Edition (GARS-2), Parent Report; GARS-2, Teacher Report; Vineland Adaptive Behavior Scales, Second Edition (Vineland II), Parent Form; Vineland II, Teacher Form; Structured Developmental History (SDH); the Woodcock-Johnson Tests of Academic Achievement III (WJ-III) (administered by a resource specialist); teacher report and interview; parent interview; two classroom observations; two playground observations; and records review. Ms. Peña-Rivera reviewed the August 2006 psychoeducational assessment, which found that Student's cognitive ability fell within the average range.

44.    Student's hearing and vision were normal. Mother reported that Student had problems with her stomach as she suffered from yeast infections and, therefore, needed a gluten free diet and no dairy, eggs, or sugar. Mother said that Student achieved all her developmental milestones within normal limits, except speech; Student did not start speaking until age two-and-a-half to three years old. Student enjoyed watching television, playing video games, and playing on the computer. English was the primary language spoken at home.

*Cognition/Processing Ability*

45.    Ms. Peña-Rivera utilized four instruments in evaluating Student's cognitive and processing abilities. The CAS was a test designed to measure intelligence as a group of cognitive processes and was composed of four sets of subtests. In the Planning Subtests,

Student was required to create a pan of action, apply the plan, verify that an action taken conforms to the original goal, and modify the plan as needed. Student scored below the low average range in the matching number and planned codes subtests, obtaining an overall Planning score below the average range. In the Attention Subtests, Student scored within the average range in expressive attention subtest and well below the average range in the number detection subtest, with an overall Attention score below the average range.

46.     The Simultaneous Processing Subtests required Student to synthesis separate elements into an interrelated group using both verbal and nonverbal content. Student scored within the high average range in the nonverbal portion and below average range in the verbal-spatial subtest, achieving an overall simultaneous processing score within the average range. The successive processing subtests had Student deal with information that was presented in a specific order and for which the order drives meaning. Student scored well below average in the word series subtest and below average in the sentence repetition subtest. Her overall performance was well below the average range.

47.     The WRAML was a measure of Student's ability to actively learn and memorize a variety of information. The WRAML uses three measurable constructs. First is the distinction between "memory and learning," where memory subtests required information to be recalled and learning subtests assessed Student's acquisition of new information. The second construct was the distinction between visual and verbal modes of processing. The third construct was familiarity with recalling information in both short-term and delayed situations, which evaluated the decay of information over time (forgetting). This information helped discriminate between retrieval weaknesses and memory weaknesses.

48.     In the WRAML Verbal Memory index, Student's score was well below the average range, with high variability in performance amongst the subtests. For example, she demonstrated average ability in verbal learning but well below average in memorizing and recalling meaningful information (story memory). On the Visual Memory index, Student scored in the average range. Her design memory was low average while her picture memory was high average. Student's scores on the Attention and Concentration index and the General Memory index were in the below average range.

49.     The C-TOPP assessed Student's phonological awareness, phonological memory, and rapid naming. Phonological Awareness index measured Student's awareness of and access to the sound structure of her oral language. Student's overall Phonological Awareness score fell within the average range.

50.     The Phonological Memory index measured Student's coding of information phonologically for temporary storage in working or short-term memory. Phonological memory impairment could constrain the ability to learn new written and spoken vocabulary. Student scored below the average range in the area of memory for digits and with the average range in the area of non-word repetition. Student's overall phonological memory skills were within the low average range.

11

51.     C-TOPP's Rapid Naming subtests measured the efficiency of Student's retrieval of phonological information from long-term and permanent memory. Individuals who show poor performance on rapid naming tasks are expected to have difficulty reading fluently. Student's overall rapid naming skills were well below the average range.

52.     The Bender Gestalt II required Student to look at and copy geometric designs of increasing difficulty. She demonstrated visual motor integration skills at a level better than 47 percent of her age peers, which indicated average visual-motor ability.

53.     Ms. Peña-Rivera summarized by noting Student's cognitive strength was in the area of visual processing, especially with visual patterns and stimuli. Student showed strength in her ability to recognize and recall stored mental representations or images of visual stimuli.

54.     Student had three areas of cognitive weaknesses. The first was in the area of auditory processing and auditory short-term memory, especially in her ability to perceive, analyze, and synthesize patterns among auditory stimuli and her ability to attend to and immediately recall temporarily ordered elements in the correct order after a single presentation.

55.     Student's second cognitive weakness was in the area of processing speed (attention), especially in her ability to fluently perform cognitive tasks automatically. The third cognitive weakness was in the area of association (long term retrieval), especially in Student's ability to store information (e.g. concepts, ideas, items, names) in long-term memory and to fluently retrieve it later through association.

*Academic Achievement*

56.     Ms. Peña-Rivera interviewed Ms. Valles regarding Student's performance in the second grade general education class. Ms. Valles stated that Student usually completed homework on time, but noted that Parents usually assisted. Student did not complete her classroom assignments independently, having to be prompted by her aide or Ms. Valles. Student demonstrated relative strength in math. Student had difficulty with reading, decoding, and comprehension. Student would get overwhelmed when reading a long story in class and would ask her aide to read. Student also exhibited difficulty with blending and only knew 18 of 21 consonant blends.

57.     On the WJII, Student scored within the low average range in the areas of reading decoding and reading comprehension. She scored below the average range in reading fluency. Her broad reading composite score fell in the below average range. In the area of writing, Student scored in the below average range in writing fluency and spelling subtests. She scored within the average range in the writing samples subtest. Her broad written language score fell within the below average range. In math, Student scored with the average range in math computation, low average range in math reasoning, and below average range in the math fluency subtests.

12

*Language and Communication*

58.    During Ms. Peña-Rivera's interactions with Student, Student rarely used spontaneous speech to communicate. Receptively, Student was able to follow very simple directions. Student had difficulty in understanding more than one-step directions and instruction had to be modified and repeated. Student would display echolalia and atypical speech rhythm. Student's voice level varied from being almost inaudible to very loud. Ms. Peña-Rivera referred to the speech and language report for further information.

*Motor Skills*

59.    Ms. Peña-Rivera observed Student participate in outdoor activities. Student needed guidance and prompting for activities such as throwing the ball to make a basket, kicking the ball, and playing patty cake with her peers. Student frequently missed when attempting to kick a moving ball and, though able to throw the ball, was not able to make a basket. Mother reported that Student had difficulty in steering and peddling while learning to ride a bicycle. Ms. Peña-Rivera suggested a screening by an Adaptive Physical Education coach to rule out gross motor delays. In the area fine motor skills, Ms. Valles reported that Student had the tendency to print large letters and had difficulty in copying information from the board.

60.    Ms. Peña-Rivera administered the Bender Gestalt II, a test of visual motor integration skills. Student was asked to copy shapes of increasing difficulty. Student's overall score fell within the average range. Ms. Peña-Rivera referred to the occupational therapy assessment report for further information regarding motor skills.

*Social-Emotional Functioning*

61.    Ms. Peña-Rivera observed and assessed Student over a period of three, nonconsecutive days. In one session, student willingly came to the testing room with her aide and she worked on all tasks, but needed constant prompting, encouragement and guidance to finish a given item. Student displayed fleeting eye contact and had a very short attention span. Frequent verbal reminders were necessary to get Student to pay attention. She often responded better to a light touch on her hands or to a light finger touch on her chin. Student's attention and understanding improved when she looked at the speaker, but she was only able to focus on the speaker for a very brief time. Student responded well to rewards, such as a preferred activity like playtime with the available toys. Students displayed self–stimulatory behaviors, such as rubbing the tips of her fingers against each other. She also bit her nails.

62.    When observed in the classroom on September 27, 2010, Student was in a blending lesson and required constant redirection by the aid. Though the aide attempted to guide her throughout the assignment, Student refused to follow the procedures for the activity (sounding, pointing, and writing the word sound by sound). Student made high-pitched sounds, sucked on her fingers, and mumbled words. She would hug her peers for no

apparent reason and generally demonstrated very limited attention span.  Student had little understanding of space boundaries.  For example, she would put her head down on her desk stretch her arms across onto her neighbor's desk, requiring redirection.  Since the weather was extremely hot on the day of observation, the students had indoor recess in the auditorium, where they were shown a Tom and Jerry movie.  Student did not want to see the movie and did not want to stay in the auditorium; she got under one of the seats.  When Student was given the option of going to the library, she got up and walked to the library without incident.

   63. When observed on November 1, 2010, Student had difficulty in sustaining attention for the whole math lesson.  The aide prompted Student to look at the teacher and to complete the task, which she did.  Because Student refused to finish her lunch in the cafeteria, she ate on the playground.  When given an opportunity to play with other girls, she merely continued eating.  When one of their girls told Student to use the fork instead of her fingers, she did.  When finished eating, her aide prompted her to join the class for a game of kickball.  Student was unaware of the rules of the game.  Her aide told her what to do, and modeled where to run.  Student did not initiate any interaction with her peers.  Though she complied with requests and seemed to enjoy the game, Student did not display any spontaneous social interactions.

   64. Ms. Valles reported that Student's attitude varied depending on her mood.  If she was happy, she usually liked her assignment.  When her attitude was negative, she usually did not like the task and wanted nothing to do with it.  Ms. Valles reported some self–injurious behaviors.  Once, Student walked away from the classroom because she did not want to do the assigned task and stated she was going home.  However, Ms. Valles easily persuaded her to return to class.  Ms. Valles also saw that Student did not seem to play with other students, yet she had hugged her partner and invited her home.  When the other girls in class tried to engage Student, by inviting her to accompany them to the restroom, she joyfully agreed.

   65. During the parent interview, Mother said she enjoyed Student's creativeness, innocence, strength, imagination, and "the love she shares with those in her life who love her."  Mother reported concerns with behavior, especially Student's high energy level, difficulty in adapting to changes in routine and low frustration tolerance.  Mother reported that Student would become easily upset when told to do something she did not want to do, when denied something she wanted, or when not allowed to engage in a preferred activity. Mother reported that when Student got upset, she would usually shut down and refuse to comply.  At times, Student would tantrum by dropping to the floor and refusing to get up. Sometimes, Student would run away. Mother said that Student would hit her head on her knees, although this behavior had decreased and had not occurred for at least two weeks before the interview. Mother told Ms. Peña-Rivera that Student was disciplined by getting three to five minute timeouts, where she sat in a chair; then, Student would have to apologize and complete any unfinished task.

66.     Mother reported that Student enjoyed watching television, playing video games and playing on the computer. Student often repeated phrases heard on TV shows. Student loved to draw and played on several musical instruments. Socially, Mother reported that Student had difficulty in engaging and initiating interactions with her peers. She usually had to be prompted and encouraged to relate with other children her age.

67.     Ms. Valles completed the teacher rating forms of the GARS-2, describing a child's behavior, which enabled a probability estimate of autistic disorder. Based upon Ms. Valles' responses, Student exhibited characteristics associated with autism. These characteristics included: staring at hands, objects, or items in the environment for at least five seconds; licking, tasting, or attempting to eat inedible objects; making high-pitched sounds or other vocalizations for self-stimulation; repeating words verbally or with signs, repeating words or phrases over and over; looking away or avoiding looking at a speaker when her name was called; not initiating conversations with peers or adults; laughing, giggling or crying inappropriately; doing certain things repetitively and ritualistically; and responding negatively or with temper tantrums when given commands, quests or directions.

68.     Mother completed the parent report of the GARS-2. Mother's responses also indicated that Student exhibited characteristics associated with autism, observing the same characteristics and behaviors reported by Ms. Valles.

69.     Ms. Valles completed the teacher scales of the BASC-2, where she rated Student on 160 behaviors that were grouped into domains. The rating scale yielded composite scores for Externalizing Problems, Internalizing Problems, and School Problems. These scores comprised the Behavioral Symptoms Index and this index reflected the overall level of Student's problem behavior. Ms. Valles reported significant concerns in the areas of attention problems, atypicality, adaptability, and social skills. At–risk concerns included aggression, conduct problems, somatization, withdrawal, leadership, study skills, and functional communication. Student was almost always: easily distracted; babbled to self; picked at her own hair or nails her clothing; said things that made no sense; broke the rules; easily lost her temper; and defied teacher. Student was reported to almost never: make friends easily; quickly join group activities; adjust well to new teachers; adjust to change in routine; share toys or possessions with other children; work well under pressure; make decisions easily; encourage others to do their best; analyze the nature of problems before trying to solve; read assigned chapters; and exercise good study habits.

70.     Mother completed the parent scales of the BASC-2, where she rated Student on 138 behaviors that were grouped into domains. The scales yielded composite scores for Externalizing Problems, Internalizing Problems, and a Behavior Symptoms Index. An Adaptive Profile was generated. Mother reported significant concerns in the areas of atypicality, withdrawal, attention problems, activities of daily living and functional communication. At–Risk concerns included adaptability, social skills, and leadership. Mother's BASC-2 scale responses were strikingly similar to that of Student's teacher.

71.     Ms. Peña-Rivera summarized Student's social-emotional functioning, which exhibited autistic-like behaviors.  Student had a history of relating to people inappropriately and continued impairment in social interaction from infancy through early childhood. Student had very limited meaningful social interactions.  She did not initiate interaction with peers.  Although her peers sought her company, Student appeared unaware of their presence unless she was prompted by an adult.  Student was complacent to be part of a group but seldom interacted with adults or peers.  She displayed extreme resistance to controls and was usually noncompliant when given commands or directives when she did not like the assigned task.  Student displayed peculiar motor mannerisms and atypical speech rhythm.  Student had difficulty with changes in routine and reacted by refusing to comply and by dropping to the floor.

72.     Ms. Peña-Rivera concluded that Student would benefit by having a consistent daily routine, with clear rules and expectations.  She suggested using social stories to prepare Student for changes.  She also recommended that Student participate in social skills groups with emphasis on peer interactions.

*Self-Help/Adaptive Skills*

73.     Mother and Ms. Valles completed the parent and teacher scales of the Vineland II, which measures adaptive behavior for ages birth though 90.  The scales addressed three domains – Communication, Daily Living, and Social Skills and Relationships.  Ms. Peña-Rivera detailed the rated behaviors for each domain and explained the significance of the ratings.

74.     On Mother's scales, Student's overall Communication score fell within the moderately low range.  The individual subdomain scores indicated a significant difference between her written subdomain and her receptive subdomain.  Student's overall daily living skills score also fell within the moderately low range, with significant differences between the personal and community subdomains.  Student's socialization score also fell within the moderately low range with no significant differences in the subdomains.  Although Student's overall adaptive behavior level was moderately low, her socialization domain was significantly lower than the median score for all other domains.  Ms. Peña-Rivera stated that such a difference indicated that Student's social skills were a weakness relative to her skills in other areas.

75.      On teacher's scales, Students scored in the low range for communication, daily living skills, and socialization.  No significant differences were found between any domains or subdomains.  Student's overall adaptive behavior level fell within the low range.

76.     Overall, Student had adaptive delays across the home and school setting in the areas of receptive communication, community living skills, interpersonal relationships, and play and leisure time.  Student demonstrated higher adaptive skills in the home setting, which could be attributed to feeling more comfortable at home as well as being more compliant and following Mother's directives.  Student's difficulties in adjusting to new environments and

16

people could have contributed to some low scores. Student was not willing to perform requested tasks, perhaps preferring for adults in the classroom to do it for her. In terms of safety, Student was not observed to exhibit self–injurious behaviors in the school setting. However, when she got upset or tried to avoid an unpleasant task (such as writing), she would get up and drop to the floor.

77.    Ms. Peña-Rivera determined that Student would benefit by having a behavioral chart with clear rules and expectations, a daily parent-teacher communication log, a behavioral support plan (BSP) that focused on work completion, and a BSP to decrease non-compliant behavior. The BSP would also include teaching Student how to express frustration and more appropriate ways (asking for break) instead of tantrumming, dropping to the floor, or walking away.

*Summary, Conclusions, and Recommendations*

78.    Ms. Peña-Rivera indicated that Student seemed to be functioning within the average range of her cognitive ability. Cognitive strengths were found in the areas of visual processing. Student demonstrated processing deficits in the areas of auditory processing, association, processing speed, and attention. The assessment also found that Student exhibited autistic-like behaviors. Based on the results, Student met the eligibility as autistic and may be in the need of special education services.

79.    Ms. Piña-Rivera recommended that the IEP team discuss appropriate placement, in light of the assessment findings. She counseled the use of high interest materials, scaffolding techniques when teaching a new concept, repetition of information, and consistent daily routine. She recommended development of a BSP, with emphasis on work completion and compliant behavior. Verbal and visual cues would assist Student in transitioning and social stories would prepare Student for changes. A daily parent–teacher log would assist in consistent communication. She recommended an adapted physical education (APE) screening to rule out gross motor delays. Finally, Ms. Peña-Rivera advised designated instructional services (DIS) for counseling, with an emphasis on appropriate peer interactions.

*November 9, 2010 Reevaluation IEP*

80.    On November 9 2010, District convened an IEP team meeting to discuss the most recent evaluations. Attending were: Mother; Father; SELF Advocate, J. Wiley Campbell; SELF IEP Advocate, Jim Campbell; administrator, Ms.Choe; general education teacher, Ms.Valles; special education teacher, Mr. Jetton; Ms. Peña-Rivera; Ms. Coulter;[4]

---

[4] Ms. Coulter testified at the hearing, stating she could not recall whether Ms. Choe talked to her about the LAS assessment before the November 2010 IEP meeting. Since LAS is not an issue, her testimony and LAS assessment are not detailed in the findings of fact.

school nurse, Yo Po; occupational therapist, Lindsay Osborn; District EIS coordinator, Christopher Eaton; and Ms. Winkelman.

81.     Ms. Choe was the AP-EIS for Heliotrope. She testified at the hearing. Ms. Choe worked for District between 1977 and 1985 and continuously from 1988. She had been the AP-IES at Heliotrope from October 2007 to July 2009, when she was placed as a bridge coordinator, in special education, because of budget cuts. She returned as Heliotrope's AP-EIS in October 2010.

82.     Ms. Choe received a bachelor's degree in 1974, from California State University, Los Angeles, where she also worked on her masters in reading and language arts, from 1996 to 1998. In 2005, she received a masters of arts in administration from California State University, Northridge. She received a standard life elementary teaching credential in 1974, a partial Korean bilingual credential in 1978, a language development specialist credential in 1999, and an administrative service credential, tier 1, from Cal State Northridge, in 2005. Ms. Choe obtained a reading certificate in 2006 and a reading credential in 2008, from University of California, Los Angeles. In 2009, she received an administrative service credential, tier 2, from Cal State Northridge. Over her years of employment with the District, Ms. Choe has consistently taken classes related to her duties, from various universities and District educational programs.

83.     As an AP-EIS, Ms. Choe was responsible for administering the special education program at Heliotrope. This included overseeing the special education program, special education teachers, managing and coordinating special education service providers, attending and administrating IEP meetings, and communicating with parents and their representatives on behalf of the school. Ms. Choe attended the Student's IEP meetings as the District administrator.

84.     Before the IEP meeting, Ms. Choe discussed the various assessments with the assessors. The District IEP team members did not meet prior to the IEP team meeting. At the IEP team meeting, the assessments were presented and considered, PLOPs were reviewed and discussed, and goals were proposed, discussed, and developed. Ms. Choe testified that there was substantial conversation regarding placement.

85.     During the meeting, each page of the IEP was reviewed and evaluated by the members, including Mother and Student's advocates. Based on the input of Mother and the advocates, pages were revised and wording was modified. Ms. Choe persuasively testified that Mother and her advocates fully and vigorously participated in the IEP discussions.

86.     The PLOP for health indicated that health was not an area of need and did not impact participation and progress in the educational program.

87.     The PLOP for mathematics referred to the WJIII, observations and work samples. Student's strengths included writing numerals and understanding basic concepts in addition and subtraction. However, Student struggled to develop grade–level computation

18

skills and an understanding of grade level math concepts. Although math was a relative strength for Student, she was working well below grade level standards.

88.     The IEP team reviewed Ms. Coulter's language and speech assessment, which the team used to prepare a particularly detailed PLOP for language function. Student took the Receptive One-Word Picture Vocabulary Test–2000 (ROWPVT-2000) and the Expressive 1–Word Picture Vocabulary–2000 (EOWPVT-2000), which indicated that Student's receptive and expressive vocabulary skills were in average range for her age level.

89.     On the Preschool Language Scale-4 (PLS-4), auditory comprehension skills were low average while expressive communication was well below average. Her total language development was within the below average range.

90.     Student was administered the Oral and Written Language Scales (OWLS) which obtains a comprehensive sampling of language tasks. These tasks address vocabulary, grammar, pragmatic structures, and higher order thinking, providing a clear picture of an individual's ability to understand and produce connected language, both spoken and written. Student's scores indicated that Student was below average to well below average. Receptively, Student had difficulty comprehending qualitative concepts, quantitative concepts, time/sequence, and syntax. She displayed weaknesses in the comprehension of plural nouns and verbs, prepositional phrases, singular nouns and verbs, past tense verbs, verb phrases, inferences, high–level vocabulary, and complex sentence structures. Expressively, Student displayed weaknesses in the use of quantity concepts, qualitative concepts, morphology, phonological awareness, and integrative language skills. Student was unable to initiate or sustain a conversation. She also did not use appropriate eye contact without continuous prompting.

91.     The language function PLOP also considered language samples, observations, teacher's input and record review. In summary, the language function PLOP stated that Student's expressive language skills were in the well below average range and her receptive language skills were in the below average range. There were wide gaps between her receptive and expressive language skills. These gaps indicated that Student would need assistance to achieve full academic potential in the classroom. Student also had difficulties attending, comprehending, and responding appropriately to demonstrate competence during oral language tasks. The assessor recommended that Student receive LAS services to improve her communication skills and to support her academic progress in the classroom setting.

92.     The articulation PLOP utilized the Goldman-Fristoe Test of Articulation 2, an oral motor exam, and language samples. Student had difficulty discriminating and producing the age-appropriate speech sounds in words, phrases, sentences, and during oral reading. LAS services were recommended to improve articulation skills and to support academic progress.

93.     In the cognition and processing PLOP, student demonstrated average cognitive ability.  Her cognitive weaknesses were in the areas of processing speed (attention), association (long-term retrieval), and auditory processing.  These adversely impacted her ability to access the general education curriculum in the areas of reading, writing, and math.

94.     The social–emotional functioning and the self–help/adaptive skills PLOPs included Ms. Peña-Rivera's findings in the psychoeducational assessment.  The PLOP summarized the various autistic-like behaviors and adaptive delays in the home and school setting, noting that they impact her ability in the areas of reading, writing, and math.  The PLOP also reviewed the psycho educational assessment findings.  In terms of safety, Student was not observed to exhibit self–injurious behaviors in the school setting.  However, to avoid an unpleasant task, she would on occasion get up and drop to the floor.  She had also walked away from the classroom once but stood outside the room and was easily persuaded to return.  Student's difficulties in the areas of communication, community living and socialization adversely impacted her ability to access the general education curriculum in the areas of reading, writing, and math.

95.     The bilateral coordination-cutting PLOP indicated that Student demonstrated slight deficits related to bilateral coordination although they were not severe and could still be within the average range.  The deficits impacted Student's ability to cut along novel shapes with accuracy because she had difficulty holding and manipulating the paper she was cutting with her non-dominant hand.

96.     The IEP team developed 10 goals and objectives in reading, writing, mathematics, social emotional, cutting (bilateral ordination), expressive language, pragmatics, articulation, behavior support, and language and speech.

97.     The IEP team also developed a BSP.  Predictors of Student's inappropriate behaviors were disruption in routines, work level higher than Student's ability, lack of predictability, lack of freedom to choose, and an activity that she did not like.  The BSP listed how the environment supported the problem behavior and suggested environmental changes, structures and supports that might reduce Student's need to use inappropriate behavior.  Suggested time changes included: give more time on task, signal transitions, allow completion in parts, and provide a break.  Space changes included: preferred seating and use of the study carrels.  Suggested material changes were: accommodated work, hands-on learning, tasks organized, and high interest materials.  Supportive interaction recommendations included: cue the student, model, verbally praise student, praise successes, and peer models.

98.     The BSP indicated that Student's inappropriate behavior was to avoid tasks that were too difficult or too long.  In an attempt to avoid this behavior, the BSP was to encourage Student to ask for assistance when the task was too difficult and to ask for break when the task was too long.  The BSP included a behavioral goal, which was for Student to independently focus on a task for five minutes with 90 percent success.  Progress would be measured by daily charting, behavioral logs and weekly reports.

20

99.    The District members of the IEP team recommended that Student be placed in an early education (EE) special day program (SDP), with a general education curriculum, at Heliotrope. Accommodations would include: preferential seating near the teacher; more time on assigned tasks; small-group instruction; use of graphic organizers and directions; cues to remain on task and for transitions; modified assignments; and repetition of directions. The District's offer of related services, for both the regular and extended school year, included DIS counseling and guidance, 30 minutes a week; LAS therapy, 260 minutes a month; and occupational therapy, twice a month for 30 minutes a session. Student would be pulled out of class to receive the related services. The District offered extended school year (ESY), with transportation. District did not offer transportation for the regular school year.

100.    Mother and the advocates believed that the appropriate offer was for general education classroom placement, with a general education curriculum, RSP support, and a full-time, one-on-one behavioral specialist. Such an offer would include all related services already contemplated by the District. Mother also requested home to school transportation for the regular school year.

101.    Mother testified that the District announced they were offering SDC placement and that no other options were discussed or provided. Mother said that no one asked her about what she thought about placement and that there were no discussions among the IEP team members, including Mother and the advocate, as to placement.

102.    Mother's recollection is not supported by the transcript of the meeting which Student submitted as evidence. The SELF advocates recorded the IEP, which took about four hours, including breaks. The transcription of the audio is 106 pages in length; Mother and/or her two advocates are speaking on 100 pages. During the first hour and half of the meeting, Ms. Peña-Rivera presented her psychoeducational report, Ms. Coulter presented her LAS assessment, and the team, simultaneously, worked on the PLOPS. After a break, the OT presented her assessment and the team completed the PLOPS and moved onto goals. Then the team discussed placement. Mother and her two advocates were deeply involved, asking questions, participating in exchanges regarding Student's cognitive and performance functioning. The advocates recommended some changes in language, which were discussed and often incorporated in the IEP document. Ms. Peña-Rivera had recommended that Student be placed in an SDC class and Ms. Choe, as administrator, presented a possible class. The transcript reflects questions and suggestions regarding placement, including the possibility of home school. The transcript also indicates that it was Mother's advocates who changed the subject from a conversation about appropriate placement to whether Student needed ESY. The District did not cut off or discourage discussion of the placement recommendation or options.

103.    District continued to offer the EE class, which it believed was the most appropriate and least restrictive placement to meet Student's educational needs. Ms. Peña-Rivera testified that the EE class had approximately nine students, one special education teacher, and two adult aides. Based upon Student's assessed needs, a behavior specialist was

21

not required. However, the District offered to conduct a functional behavioral analysis (FBA) to further determine Student's behavioral needs. District also offered a pre-referral screening by an adapted physical education (APE) specialist and physical therapist (PT).

104.    At the conclusion of the meeting, the Parents did not sign the November 9, 2010 IEP.

105.    By letter dated November 10, 2012, Ms. Campbell wrote Ms. Choe, stating that Mother consented to the following portions of the November 9, 2010 IEP: (1) eligibility; (2) annual goals and objectives; (3) ESY; (4) ESY transportation; (5) instructional modifications; (6) instructional accommodations; (7) BSP; and (8) the related services, including LAS, OT and DIS counseling. Mother did not consent to the following portions of the IEP: (1) instructional setting/placement; (2) District's failure to provide regular school year transportation; (3) District's failure to provide a one-on-one aide or behavioral specialist to ensure Student's safety. The SELF letter stated that Mother expected continuation of Student's current placement in the general education environment, including the provision of a one-on-one aide, as a result of Mother's disagreement with the special education placement offered by District. Ms. Campbell reserved all rights regarding the November 2010 IEP.

106.    By letter of November 19, 2010, Heliotrope Assistant Principal Ms. Choe wrote Ms. Campbell and Mother, responding to the November 9, 2010 IEP and the November 10, 2010 correspondence from SELF. Ms. Choe acknowledged those components of the November 9, 2010 IEP to which Mother agreed, noting that Mother had not agreed to the offer of placement in a special education classroom. She affirmed that Student would remain in her current general education placement pursuant to the last agreed-upon IEP of October 13, 2010. Ms. Choe expressed the hope that the parties would be able to resolve the dispute regarding placement without having to resort to due process, asking them to notify her should they wish to participate in the District's informal dispute resolution process.

107.    Ms. Choe addressed four additional issues from the IEP. First, she noted the IEP team meeting discussions regarding the continuum of placement options available to Student. Mother and her advocates had requested that Student be placed in the general education classroom; the IEP team discussed this option. Ms. Choe reiterated that the District's members believed Student required a smaller classroom setting and more intensive instruction at this time. Mother's belief that Student could be placed in a general education classroom if she had a one-on-one aide was also discussed. The District members felt that general education placement with the aide would be more restrictive than placement in the special education classroom without an aide. Some team members expressed concern that Student had already become overly dependent on the aide who had been provided to her as temporary support. The District members also believed that the special education classroom would foster independence and assist Student in accessing the classroom instruction directly from the teacher. All IEP members agreed that the goal was to eventually transition Student to a general education setting. However, the District believed that Student required a smaller classroom setting with individualized instruction that simply was not available in the general

22

education classroom.  The District also believed that a one–on–one aide would be detrimental to Student's success and her ability to obtain independence and was, therefore, not satisfactory.

108.    Ms. Choe addressed Mother's request for transportation during the regular school year, to the school from home. Ms. Choe noted that Mother and her advocates wanted transportation because Mother might obtain employment.  Ms. Choe recalled that the issue was discussed and that the District IEP team members agreed, and continued to agree, that Student did not require transportation during the regular school year in order to benefit from her special education.

109.    Ms. Choe testified that District would provide transportation for special education students whose placement was not at their school of residence or if the child was physically unable to get to the home school. Here, District offered transportation to Student for the ESY because the summer class was not at Student's home school.  The transportation would be from home school to the ESY school site, not from Student's home to ESY. District did not offer Student transportation for the regular school year because she was not physically unable to get to Heliotrope, which was a few blocks from Student's home. Ms. Choe recalled that Mother had expressed concern regarding self-injurious behaviors. However, this was in relation to the need for an aide and was not for purposes of transportation. Ms. Choe stated that the transportation guidelines for IEP teams were in District's policy bulletin, 5003.3.[5] She indicated that this was explained in the IEP.

110.    Ms. Choe took issue with the advocates' and attorney's characterization that the District's provision of a one-on-one aide was an agreed-upon service provided by the October 2010 IEP.  She reminded Mother and her advocates that the aide was provided as temporary support because Student had not been in school for approximately four years and because Mother expressed concerns regarding her safety. As indicated in the October 2010 IEP meeting, the temporary support was provided until Student's needs for supervision could be determined.  Since that time, the District had assessed Student and had determined that, with appropriate placement in the special education classroom, Student did not require an aide.  As a result, the District denied the request for a one-on-one aide, at that time.

111.    Ms. Choe acknowledged that the District had agreed to conduct an FBA assessment and had determined that an APE assessment was appropriate.  Therefore, the District had already provided an assessment plan for the FBA and the APE assessments.  The District would proceed once Mother provided consent. The District was also in the process of determining whether Student had any suspected needs in the area of physical therapy.  In conclusion, Ms. Choe provided a copy of the District's notice of parental rights and procedural safeguards.

---

[5] California Education Code, section 41851.2 requires school districts to develop guidelines for use by IEP teams that clarify when SE services are required. Title 34 Code of Federal Regulations, part 300.34, defines transportation as a related service.

23

112.    Mother testified that she objected to an SDC class because she had seen such classes and was convinced that Student would model the bad behaviors of other students. Also, she believed the students in an SDC class would not be pushed "hard enough" academically.

*Functional Behavior Assessment*

113.    The District conducted an FBA, producing a report dated February 24, 2011. Ms. Peña-Rivera was the assessor and Ms. Valles and Ms. Reymundo assisted in the report's completion. Mother, Ms. Valles, and Ms. Bunt were interviewed. Ms. Peña-Rivera reviewed assessments and IEP's to date, summarized Student's counseling progress, re-administered the BASC-2 to Mother and Ms. Valles, reviewed the previous four months of Student's logged behavioral records, gathered timed behavior data, and conducted four observations.

114.    Mother expressed the same behavioral concerns as she did in her prior formal interview of October 20, 2010. Mother indicated that Student was disciplined by getting three-to-five minute timeouts, where she would sit in a chair and then apologize and complete any unfinished tasks. She also reported that Student's behavior was getting worse at home and it appeared to be related to her behavior at school. She thought that Student's current behavior was like it was when she first started to work with Ms. Bunt

115.    On the BASC–2 parent's scales, Mother reported behaviors similar to her prior report. Generally, Mother's scales reported significant concern in the areas of atypicality, withdrawal, attention problems, adaptability, leadership, activities of daily living, and functional communication. At–risk concerns were noted in the area of social skills.

116.    Ms. Valles reported behaviors similar to those in her prior interview of October 2010. Student's behavior seemed to have been getting more physical (eight incidents compared to three incidents prior to the November 2010 IEP). Student hit Ms. Reymundo when she got frustrated with her class work or when she did not want to do an assigned task. Student also attempted to hit Ms. Valles, as well as bang her head on her desk, on the floor, and on Ms. Valles' hand. Student exhibited behavioral difficulties on the schoolyard when there were no academic demands. Ms. Valles reported slight improvement socially with peer interaction; Student wanted to be part of the group and responded well to her peers' attempts to interact. Student apologized (most of the time) right away when she hit Ms. Reymundo.

117.    Ms. Valles' BASC–2 teacher's scales reported behavioral concerns similar to those enumerated in October 2010. Significant concerns were reported in the areas of hyperactivity, depression, attention problems, atypicality, withdrawal, and adaptability. At–risk concerns were reported in the areas of somatization, aggression, conduct problems, learning problems, social skills, leadership, study skills, and functional communication. Ms. Valles reported that Student almost always had problems reading and keeping up in class.

24

118.    Ms. Peña-Rivera interviewed Ms. Bunt, who reported that she had worked with Student for two years when she was in preschool as a "shadow" (redirecting Student's attention, employing behavior modification).  She also worked with Student the previous summer in a small group.  Ms. Bunt reported that Student initially was stubborn and would refuse to do any class work.  Ms. Bunt also reported that Student was hitting and banging her head, but this conduct significantly improved with consistent behavior modification techniques.  Ms. Bunt believed that Student was very intelligent and capable of doing grade level work, but clear and strict boundaries were needed to assure that Student would complete her class work.  Ms. Bunt stated that Student responded well when limits were set and when the behavior strategies were consistently implemented.  She reported that Student should also be rewarded for positive behavior.  Ms. Bunt opined that it was a disservice to Student if she was not learning to her potential.  Ms. Bunt stated that when Student was working with her, she was capable of doing class work for two hours with minimal off task behaviors.

119.    Ms. Peña-Rivera reported that Student had been receiving DIS counseling since November 2010 and had made partial progress toward meeting her first incremental objective in her IEP counseling goal.  Student was able to greet others with maximum adult prompting during her sessions.  Student was also able to conduct a very simple conversation with maximum adult prompting, but it depended upon whether Student was interested the topic.  Student usually came willingly to the counseling sessions, except on a couple of occasions when there had been prior inappropriate behavior in the classroom.

120.    Ms. Peña-Rivera noted that the BSP was developed because Student had consistent off task behaviors, refusing to work on certain assignments.  The IEP team hypothesized that the function of Student's behavior was to avoid difficult and long tasks.  Student's behavioral goal was to independently focus on a task for five minutes with 90 percent success.  Ms. Piña Rivera gathered data to analyze Student's exhibited behavior.

121.    Ms. Reymundo had maintained a behavioral log for Student since September 2010.  Ms. Peña-Rivera reviewed the log entries, noting various incidents and the action taken by the teacher or Ms. Reymundo in response.  Student was regularly reported to be defiant, by refusing to do her work, verbally objecting to participate in classroom activities, exhibiting tantrum like behaviors, and threatening or actually hitting the aide, teacher, or LAS therapist.  Student would throw papers and books on the ground, drop to the floor, run around the classroom, crawl under other pupils' desks, and run away from the aide or teacher.  She would yell, "No," "You do it," "I am going to hit you," "I am going home," and "I want to go home."

122.    Between January 20 and February 11, 2011, Ms. Peña-Rivera had Student's teacher and aide gather and report data, using even time interval frequencies, and the ABC model.  "A" is for antecedent (trigger or cause), "B" is for the inappropriate behavior, and "C" is for consequence (action taken).  The antecedent typically consisted of Student being

25

asked to work on an assignment which was too difficult or to stop an activity which she was enjoying or preferred.

123.    Ms. Piña-Rivera observed Student on four different days, using a 15–minute interval observation form, three times per observational day. Student was frequently observed to have been working with teacher one-on-one, preparing materials for lessons, laughing inappropriately, staring blankly and daydreaming, doodling, looking around, looking at hands, fiddling with objects and fingers, talking and singing to self, putting fingers in mouth, and finger flickering. During the interviews, Student required frequent redirection and behavioral reminders, such as to use a "whisper voice." Student followed class routines, with adult assistance, and was able to look at her environment for clues as to what she should be doing (e.g. looking at her classmate to see which book was needed). Student became frustrated when the class assignments were difficult for her. The class lessons would go at a fast pace and Student sometimes appeared confused by the class assignment.

124.    Ms. Piña-Rivera summarized her observations, analyzed the antecedents and consequences (ABC) data, and outlined positive replacement behaviors. She identified two categories of behavior. Behavior 1 was Student's refusal to do tasks, causing her to be verbally defiant, tantrum (e.g., dropping to floor) or hitting. The function of Student's behavior was her need to escape or avoid tasks that she perceived as too difficult or long. The positive replacement behavior was for Student to ask for help or request a break when presented with an academic task that was difficult for her.

125.    Behavior 2 was Student's physical aggression (towards herself or others) when she did not get to spend more time on a preferred interest. The function of this behavior was for Student to continue or gain access to a desired activity. The positive replacement behavior was for Student to gain access to a desired activity by following an activity schedule. She would spend more time on the desired activity only after she had followed directions and rules. When angry or upset, Student could request a break or time away.

126.    Ms. Piña-Rivera made 10 recommendations to address Student's inappropriate behaviors. Modify Student's class assignments to her ability level, allowing for completion in parts. Teach Student relaxation techniques to be used when angry or frustrated and remind her to use the techniques when she started to exhibit inappropriate behavior. Utilize visual cues and taps on Student's shoulder as reminders to stay on task. Avoid loud auditory stimulation. Develop a "behavioral reminders" picture chart to reinforce appropriate behaviors. Use timeouts to minimize inappropriate behavior. Develop a day schedule of the services Student receives throughout the day, reminding Student of transitions. Provide a "reinforcer menu," which lists items or activities that Student would be willing to work toward, as reinforcement for appropriate behavior. Modify the BSP to address the assessment's identified targeted behaviors. Provide Student with responsibilities or classroom tasks that would allow her to get positive attention and recognition from her peers. Praise her successes, such as with "high fives." Continue with DIS counseling services.

*March 1, 2011 Amendment IEP*

127.    On March 1, 2011, District convened Student's IEP team meeting, which was an amendment of the November 9, 2010 IEP. Attending were: Mother; Father; J. Wiley Campbell; Jim Campbell; Ms. Bunt; administrator, Ms. Choe; Ms.Valles; special education teacher, Victoria Kassa; Ms. Peña-Rivera; Ms. Coulter; APE teacher Phyllis Maruyama; audiologist Rima Baumberger; and District legal counsel, Airionna Whitaker. The IEP team met to receive and consider the FBA, APE, and CAPD assessments and evaluations.

128.    The meeting started by reviewing the IEP PLOPs. Ms. Valles updated the Reading and Writing PLOPs with OCR unit testing scores in fluency, reading comprehension, reading skills, spelling, vocabulary, and writing. She updated the Math PLOP with the second quarter percentage of 60 percent. Student's enumerated challenges remained unchanged for these three PLOPs. The PLOPs for cognition and processing, social-emotional functioning, self-help/adaptive skills, and bilateral coordination were unchanged. Ms. Coulter updated the language function and articulation PLOPs to indicate that Student was making progress in the areas of articulation and making sounds in target words. Ms. Piña-Rivera updated the DIS counseling PLOP, as detailed in her FBA.

129.    A new PLOP was developed for auditory processing and was based upon a central auditory processing disorder (CAPD) evaluation, conducted by audiologists Ms. Baumberger and Susan Diaz–Rempel. A central auditory processing disorder could not be determined, even though testing was modified to meet Student's needs. The less linguistically loaded tests from the CAPD battery were utilized but were inconclusive. The team encouraged Parents to pursue a request for CAPD evaluation when Student got older, with better developed language, memory and attention skills.

130.    Ms. Maruyama reported the results of her APE assessment and observations in developing a new PLOP. Student exhibited difficulty in catching bounced and tossed balls from various distances. She also struggled with hopping and skipping. Student's possible inexperience with gross motor play may have impaired her ability to participate with peers in physical education activities. Ms. Maruyama recommended that Student received direct physical education services provided by an APE specialist, twice a week, for a total of 60 minutes.

131.    Ms. Piña-Rivera presented her FBA and the IEP team developed a new PLOP for functional behavior. Ms. Piña-Rivera updated the DIS counseling PLOP, as detailed in her FBA.

132.    The IEP team did not change or alter the previously agreed upon 10 goals and objectives in reading, writing, mathematics, social emotional, cutting (bilateral ordination), expressive language, pragmatics, articulation, behavior support, and language and speech. The IEP team noted that Student had made partial progress toward her second objective for the social emotional goal, related to age-appropriate peer interaction. Student had met her

27

first objective toward the cutting goal. Using the APE evaluation, the team added a goal and objectives for object control.

133.    The behavior support goal, number 9, was for Student to independently focus on a non-preferred task for five minutes with 90 percent accuracy. Using the FBA, the IEP team developed two additional behavior goals, numbers 11 and 13. Goal number 11 was that Student would ask for assistance or request a preferred reward once an assigned task was completed when she was presented with an assignment that she perceived as being too difficult or too long, 70 percent of the time. Goal number 13 was that Student would follow adult instruction and reduce noncompliant behavior (screaming, laying down, hitting) to less than five incidents per week, with minimum adult prompting.

134.    The IEP team modified the BSP, which involved substantial discussion of the methodology and techniques to be used in addressing Student's off task, defiant, and aggressive behaviors. The BSP stated that Student would be prompted to a task and be reminded of consequences. Student would be referred to her behavioral reminders chart and be provided preferred activities and breaks as a reward. The BSP noted that Student would not be given a break when avoiding a task. The BSP stated that Student would be encouraged to ask for assistance or a break when the task was too difficult. The IEP team modified the BSP behavior goal to read, "[Student] will ask for assistance or request a break when she is presented with an assignment that she perceives as being too difficult or too long." Therefore, the BSP was unclear as to when Student could request or be given a break.

135.    Ms. Choe testified that she was informed by the behavior support team (BST) of the amount of BID hours that would support the contemplated behavior intervention implementation (BII). Since the BID had just been offered, no BID provider was at the IEP. Ms. Choe was unable to unilaterally make substantive changes to the BID hours without discussing the matter with BST, who provided the BID. The IEP transcript indicated the team discussed Mother's request for a nonpublic agency (NPA) BID and for increased hours. District indicated that its BST staff was qualified to provide the BII training. District did not offer a NPA BID. Ms. Choe increased the BID hours to 15, with no end date, saying that if the BID requires more hours, they can be increased as needed.

136.    The District members of the IEP team offered that Student be placed in an early education (EE) special day program (SDP), with a general education curriculum, at Heliotrope. Accommodations would include: preferential seating near the teacher; more time on assigned tasks; small-group instruction; use of graphic organizers and directions; cues to remain on task and for transitions; modified assignments; and repetition of directions. The team added the accommodations recommended by the CAPD evaluation. The District offered extended school year (ESY), with transportation. District did not offer transportation for the regular school year.

137.    For both the regular and extended school year, the District continued to offer related services of DIS counseling and guidance, LAS therapy, and occupational therapy. The District offered three additional related services. Student would receive APE, for both

28

the regular school year and ESY.  During the regular school year, District would provide behavioral intervention implementation (BII), whenever Student was in school.  District also offered to provide BID of 15 hours per year, with a frequency of 10 to 20 times.[6]

138.    Mother and the advocates wanted a general education classroom placement, with a general education curriculum, RSP support, and a full-time, one-on-one behavioral specialist, with all related services and transportation for the regular school year.

139.    Parents did not sign the March 1, 2011 amendment IEP.  The SELF advocates recorded the IEP, which took more than four hours.  The transcription of the audio was 119 pages in length.

140.    By letter dated March 1, 2011 and received by District March 7, 2011, Ms. Campbell wrote Ms. Choe, stating that Mother consented to the following portions of the March 1, 2011 amendment IEP: (1) eligibility; (2) annual goals and objectives; (3) ESY; (4) ESY transportation; (5) instructional modifications; (6) instructional accommodations; (7) BSP; and (8) the related services, which included the newly added BII and BID.  Mother did not consent to the following portions of the IEP: (1) instructional setting/placement; and (2) District's failure to provide regular school year transportation.  Ms. Campbell reserved all rights regarding the November 2010 IEP.  Since Mother did not agree to District's offered placement, Student remained in Ms. Valles' general education second grade classroom.

*April 12, 2011 Amendment IEP*

141.    On April 12, 2011, District convened an IEP team meeting.  Attending were: Mother; Father; Jim Campbell; Ms. Bunt; Student's private behavioral therapist, Heather Patin; administrator, Ms. Choe; BID Stephanie LaFleur; Ms. Kassa; Ms. Peña-Rivera; Ms. Reymundo; and general education teacher, Lorraine Lozano.  Though the IEP meeting was convened as an annual, the team members acknowledged the purpose was to review the BII and BID progress since the March 2011 IEP.

142.    Ms. LaFleur was assigned to be Student's BID following the March 2011 IEP's provision of BII and BID services.  Ms. LaFleur testified at the hearing.  She received a bachelor's degree in science and education from Baylor University, Texas, in 1994.  She received her general education, early childhood, and early reading credentials from Texas in 1994.  Ms. LaFleur received her multiple subject credential from California in approximately 2003, followed by a special education, moderate to severe, credential in 2006.  She completed her class work in multicultural multilingual special education at California State University – Los Angeles in 2008.

---

[6] Though BII and BID are acronyms for a service, they are also used to refer to the person who provides the service.

143.    Ms. LaFleur was a classroom education teacher from 1994 through 2000, beginning in Texas and ending at the Pasadena Unified School District (PUSD). She was a long-term substitute teacher with PUSD for about 6 months in the day treatment program. She then worked for the Los Angeles County Office of Education (LACOE) as an on-site high school SDC special education teacher with emotionally disturbed students, until 2006. She became a District inclusion teacher, which is a special education teacher who goes into general education classrooms where moderate to severe learning disabled children have been included. She would assist the teachers, co-teach, modify classwork, and generally help the special education students fit in with their peers. She did this until about 2010, when she split her time with the District's behavioral support team (BST)[7] for about a year. Since then she worked full-time as a teacher with the BST. She uses ABA and positive behavioral support, putting replacement behaviors in place. She viewed various behavioral modification methodologies as a "tool belt" of strategies to be used in addressing a child's unique needs.

144.    As the provider of a pupil's BID, she would review the IEP's, the BSP, look at what was required for the BSP, go to the pupil's classroom, collect data regarding baseline behaviors, analyze data, participate in team meetings, attend IEP's, write PLOPs, train school and classroom staff, provide performance feedback to staff, model strategies, and make suggestions. Ms. LaFleur emphasized that her duties were related to the data collection and the BSP.

145.    Ms. LaFleur had been assigned as Student's BID a few weeks before the April 2011 IEP. She gathered data, observed Student, reviewed the IEPs and behavioral records, and prepared a report for the IEP team. She presented the report, generally indicating that Student had improved, especially the previous two weeks, as demonstrated by Student's decreased aggression (she was not hitting). She had high praise for the general education teacher, Ms. Lozano, who similarly reported seeing some recent improvement in Student's behaviors. Ms. LaFleur acknowledged, though, that Student's behaviors were a challenge.

146.    Ms. Patin said she worked with Student at the Teach2Talk Academy, which Student attended before Ms. Bunt's BEST Kids Classes. Ms. Bunt and Ms. Patin strongly disagreed with any suggestion that Student had improved, insisting that Student's behaviors had regressed since beginning public school. Mother, Ms. Patin, Ms. Bunt and the advocate were highly critical of the District's behavior intervention methodology and the quality of its service by the BII, Ms. Reymundo. They claimed that Student's academic performance had also regressed, because Student's behaviors were preventing her from benefiting from the teaching. Mother, Ms. Patin, and Ms. Bunt asserted that Student was performing at grade level when she started second grade at the District, claiming that she was able to perform in a general education environment when her behaviors were properly addressed.

147.    Ms. Reymundo and Student's teacher prepared a daily behavior report or summary for Mother. The form of the daily behavior report changed over time. During the

---

[7] BST also refers to a team member.

second semester of second grade, the behavior report was primarily a short narrative of Student's behaviors and action taken by the teacher or Ms. Reymundo in response. Mother testified that the reports from March and April 2011 demonstrated that Student's behavior was not improving and that the District was not properly implementing behavior intervention.

148.    Ms. Bunt criticized the District's use of "breaks" or "time outs." Mother and Ms. Bunt asserted that Student saw breaks as a reward and a means of avoiding doing the work. They emphasized that Student must complete her class work and not be allowed to avoid the work, which would then be brought home to complete. District's view was that a break provided an opportunity for Student to control her behavior or to calm down when she would tantrum. Then, Student would return to the work. Ms. Bunt, Ms. Patin, and Mother insisted that inappropriate behavior must have negative consequence for Student, such as denying her recess.

149.    Ms. Choe stated that the District did not believe a general education classroom was the appropriate placement. District offered the BII and BID related services with a placement in a SDC, which would have about 10 students, a special education teacher, and two adult assistants. Ms. Choe and Ms. Peña-Rivera both stated that Student required the services of a special education teacher and that the general education classroom's academic demands and pace overwhelmed Student, causing frustration and anxiety, with increased inappropriate behaviors. Mr. Campbell generally responded that Student was in the general education classroom and that the District was required to address the behaviors so Student could benefit from the teaching.

150.    When the April 2011 IEP started, Ms. Reymundo was not present; she was with Student. Mr. Campbell asked that she be brought in to the meeting because he argued it would be helpful to have the person delivering the behavior services present.[8] Ms. Choe was able to exchange some personnel and Ms. Reymundo came to the IEP. Mr. Campbell, Ms. Bunt, and Ms. Patin asked Ms. Reymundo pointed questions regarding Student's behaviors, the log notes of the behaviors, and Ms. Reymundo's management of such behaviors.

151.    Ms. Bunt and Ms. Patin said the Ms. Reymundo was not adequately trained. They suggested that Student's behaviorist should have a master's degree or be a board certified behavior analyst (BCBA). Ms. LaFleur agreed to provide five days (20 hours at four hours per day) of training by a behavioral assistant from the District's behavior support team department. The behavioral assistant would work with Ms. Reymundo by teaching and modeling various modification methods and techniques. Ms. LaFleur also agreed to provide an additional 10 hours of BID services as well as have Ms. Reymundo take some of District's behavior related course studies.

---

[8] Federal and state law did not require Ms. Reymundo to be present at the IEP.

31

152.    In addition to the BID and training hours, the IEP team added BII and OT for the ESY. The District's offer of placement and services was otherwise unchanged. Both Ms. Choe and Ms. LaFleur testified that every issue at the IEP was thoroughly discussed. Mr. Campbell requested another IEP within 30 days. Parents did not sign the April 2011 IEP. The SELF advocate recorded the IEP, which took about one and a half hours. The transcription of the audio was 50 pages in length.

153.    By letter dated April 13, 2011, Ms. Campbell wrote Ms. Choe, stating that Mother consented to the following portions of the April 2011 amendment IEP: (1) eligibility; (2) annual goals and objectives; (3) ESY; (4) ESY transportation; (5) instructional modifications; (6) instructional accommodations; (7) BSP; and (8) the related services, which included the newly added BII and BID. Mother did not consent to the following portions of the IEP: (1) instructional setting/placement; (2) District's failure to discuss or provide RSY transportation. Ms. Campbell reserved all rights regarding the April 2011 IEP.

*Second Grade Behavioral Support and Intervention*

154.    Ms. LaFleur continued her BID with Ms. Reymundo, Ms. Lozano, and Ms. Valles, who returned from maternity leave. As Ms. LaFleur worked in Student's second grade classroom, she observed that Student became very frustrated when she was unable to complete work or grasp concepts as quickly as her general education peers. Student would often struggle in the midst of an assignment and Ms. LaFleur explored what could be done to reduce the anxiety. Based upon her observations and experience, Ms. LaFleur determined that providing a break when Student showed frustration and anxiety would give Student the opportunity to become more neutral; she could then return to her work.

155.    Ms. LaFleur put a system in place that provided Student with a break opportunity when necessary. Behavioral assistant Adrian Montanez gathered data regarding the use of timeouts, or breaks, to decrease Student's frustration and anxiety so she could return to her academic work. He noted the number of breaks in a given time period and recorded each break's length, using a stopwatch. He provided the data to Ms. LaFleur, who testified the strategy proved successful because; as time passed, Student took fewer breaks and the breaks became increasingly shorter. She shared this information with Mother.

156.    Student struggled with transitions. For example, Student would be reactive when Ms. Reymundo left to take her lunch and someone came to be with Student. Similarly, Student would have difficulty when Ms. Reymundo returned. Ms. LaFleur introduced strategies for transition, which included giving notice of Ms. Reymundo's departure at five minutes and three minutes before. Similarly, Student would receive such a countdown notice of Ms. Reymundo's return. Ms. LaFleur convincingly testified that she observed these strategies to be successful in decreasing Student's anxiety with transitions.

157.    Ms. LaFleur worked with the teachers to evaluate the classwork and devise means of modifying tasks, such as shortening an assignment to decrease Student's anxiety levels so she could better learn. This would allow time for Student to better manage her

classroom work and not reach a place of crisis. The teachers were very good at discussing specific behaviors and situations with Ms. LaFleur, seeking better behavioral strategies. Ms. LaFleur testified that both Ms. Lozano and Ms. Valles implemented behavioral models and evaluated the outcome.

158.    Ms. LaFleur provided support to Ms. Reymundo, implementing Student's BSP and behavior strategies. Ms. LaFleur identified Ms. Reymundo as Student's behavioral interventionist. She observed Ms. Reymundo work with Student, discussed reinforcement of good behaviors, provided words to use for rephrasing, and introduced replacement behaviors. Ms. LaFleur modeled some of the methods for Ms. Reymundo, such as verbal prompting and gestures instead of "hand-over-hand" guidance. Ms. LaFleur devised ways for Ms. Reymundo to encourage confidence in Student, giving space for Student to gain some independence.

159.    Ms. LaFleur worked with Ms. Reymundo to develop proper responses to Student's tendency to drop to the floor and tantrum. Ms. Reymundo would assure Student's safety by affirming there was adequate space around Student to move without harm to herself or others. Ms. Reymundo would ensure that credentialed staff would be able to observe such incidents, opening a door if necessary. Ms. LaFleur testified that Ms. Reymundo implemented all the BID strategies and methods.

160.    Ms. LaFleur testified that Mr. Montanez, from the District behavior support team, spent days in Student's classroom, working with Ms. Reymundo and the teacher. Mr. Montanez testified at the hearing. He had completed two years of college and had been a special education behavioral assistant since he started with District in 1997. His responsibilities included going to school classes, collecting data, observing, and implementing strategies developed by the BID. He would model methods of cuing and prompting for adult assistants and teachers. Mr. Montanez had worked with autistic children throughout his tenure with District. He also worked for students with emotional disturbance, Down syndrome, developmental delay, and other disabilities.

161.    Mr. Montanez worked in Student's classroom during April through May 2011. He observed Student with Ms. Reymundo and modeled strategies to be used with Student by Ms. Reymundo and the teacher. His time in the classroom varied, from an hour to more, two to three times a week. He modeled gestural prompts as opposed to hand-over-hand prompts, which were more restrictive and intrusive. He also assisted Ms. LaFleur in implementing the transition strategies, which reduced Student anxiety. He observed the outcome of the new behavioral strategies, noting that some were immediately successful while others required repetition for Student to understand.

162.    Mr. Montanez testified that Ms. Reymundo was very receptive to the modeling of strategies. He observed both Ms. Reymundo and the teacher implement the modeled behavioral strategies. He reported and discussed his observations with the BID, Ms. LaFleur. He believed that Ms. Reymundo benefited from the additional training.

33

163.   Mr. Montanez never saw Student strike Ms. Reymundo or anyone else.  He observed both Ms. Reymundo and teacher assist Student with her academic work.  He saw Student's behaviors improve during the time he was in her classroom.

164.   Though Ms. LaFleur provided BID services that resulted in some behavioral improvement, she testified that the general education classroom was an inappropriate placement for Student.  She believed that Student required a classroom with fewer students and teachers trained in special education.  She opined that such a setting was actually less restrictive than the general education classroom, with a one-on-one aide, to control Student's behaviors.  Student would positively respond to the smaller class size where she could learn her academics directly from a special education teacher.  Such an SDC setting would not be permanent, with the goal of transition Student to the general education classroom.  Ms. LaFleur did not believe that Student would be better served in a more restrictive, nonpublic school.

165.   Ms. Reymundo testified at the hearing.  She received an associate in arts (AA) degree from Cerritos College, Norwalk, California in 2004.  She obtained a bachelor of arts in human services from the University of Phoenix in 2008.  As part of her AA degree requirements, Ms Reymundo worked more than 300 hours with special needs children and adults in Whittier, California.  She possesses no other degrees or credentials.

166.   Ms. Reymundo has worked for the District since February 1993.  She started in infant daycare, supervising children and infants while their parents were in conference or lecture.  After six months, she became a District community representative, which included working as an assistant to attendants in school offices, including Heliotrope, three hours a day.  The remainder of the day, she worked as a general education teacher's assistant and supervised children on the playground.  After about six years, she became a special education teacher assistant in 2000, primarily for emotionally disturbed third and fourth graders.  She assisted the teacher in implementing the services and supervising the children.  About six years later, Ms. Reymundo became a special education teacher assistant in early education, working with children from kindergarten through second grade.  After approximately five years, she was assigned to Student in September 2010.

167.   She attended the District workshops each year and, since working with Student, has taken two workshops in behavioral skills at District's offices.  Though her formal title remained special education teacher assistant, she did behavior intervention with Student.  She has received behavioral training from Ms. LaFleur and Mr. Montanez.  The BID would come to Student's classroom at least once a week, observe, and implement new or modified strategies.  The modeling or teaching portion of the session would take about 10 minutes.  The BID or special education assistant would observe to assure proper implementation.

168.   Ms. Reymundo would be with Student all day.  She greeted Student when she first came to school, remained with her in the classroom, accompanied her to the bathroom, took her to auditorium for lunch, and went outside in the yard for recess.  Ms. Reymundo

34

would take her lunch at 11:00 a.m., for a half hour. Part of her responsibilities included following the IEP. Though available, she has never read the entire IEP but the general education teacher and the BID have referred her to the applicable IEP portions, including goals. She has relied upon the direction and teaching of the BID for purposes of meeting the IEP's BSP.

169.   Ms. Reymundo assisted Student in completing her schoolwork by prompting her to refocus. She would use a tap on the arm or shoulder, verbal cues, and sight cards. During the 2010–2011 school year, Student's aggressive behaviors improved somewhat. When Student first started second grade in September 2010, she was hitting two to three times a day. Such aggressive displays steadily decreased during second grade.

170.   Student exhibited self-stimulatory behaviors in the classroom. In such situations, Ms. Reymundo would quietly talked to Student, perhaps softly putting her hands over Student's hands, trying to redirect focus to the activity they were working on at the time. This usually worked to stop the self-stimulatory behavior.

171.   Ms. Reymundo used breaks and timeouts when Student would begin to be very frustrated or agitated, which often occurred when Student had a task she could not do or did not have enough time to finish. The BID had some of Student's work modified. For example, instead of doing 20 problems in the allotted time, Student would do seven or eight.

172.   For completing tasks, Student would be rewarded. Rewards included a break to do a preferred activity, having a snack, time to get some water, and time on the computer. Whenever the BID provided a strategy for an inappropriate behavior, Ms. Reymundo would implement the strategy. She believed she was qualified to do Student's behavior intervention. She believed that the behavior intervention helped Student in the second grade.

173.   Ms. Valles testified that Student's behavior somewhat improved over the course of the year. Student had difficulty completing class assignments in class, which tended to increase her inappropriate behavior. Student initially would try to run away, and had two or three times; this tendency decreased. Student would also hit Ms. Reymundo, but the hitting decreased as the year progressed. Ms. Valles implemented the IEP accommodations.

174.   Student had hit Ms. Valles three times. Once, Student hit Ms. Valles in the side of the stomach when Ms. Valles was pregnant, which scared Ms. Valles. She went to the doctor as a precaution; there was no damage. After this incident, Ms. Valles did not feel comfortable with Student. Ms. Valles was concerned Student might hit her again and questioned if Student's behaviors could be kept under control. She spoke with Mother almost every day, but could not recall if she told Mother about being hit in the stomach.

175.   Mother testified that she had heard Ms. Reymundo once say "I can't do this anymore." Ms. Reymundo testified that she never said such a thing.

*May 9, 2011 Amendment IEP*

176.     On May 1, 2011, District convened Student's IEP team meeting, which was an amendment of the April 2011 IEP. Attending were: Mother; J. Wiley Campbell; Ms. Bunt; administrator, Ms. Choe; Ms. Lozano; Ms. Valles; Ms. Kassa; Ms. Peña-Rivera; and Ms. LaFleur. The IEP team met to discuss communication between home and school relative to Student's behavior. The team agreed that a log form would be developed. Mother indicated that she would talk with the teacher and aide on a daily basis, as needed. For the third grade, it was agreed that the classroom teacher would arrange monthly meetings to discuss Student's progress and behavior.

177.     The issue of transportation for the regular school year was discussed, but the District did not offer such transportation pursuant to its special education transportation guidelines. The team agreed that the next IEP meeting would be held in June to discuss Student's third grade placement and update all PLOP's and goals. Mother requested a nonpublic agency (NPÅ) to provide the BII and the BID for the ESY. No discussion took place regarding this request; instead, the team agreed to discuss the matter at the next IEP meeting.

178.     The IEP meeting was adjourned. Parent did not consent the IEP.

*June 14, 2011 Annual IEP*

179.     On June 14, 2011, District convened Student's annual IEP team meeting. Attending were: Mother; Jim Campbell; Ms. Bunt; administrator, Mr. Eaton; Ms. Coulter; Ms. Valles; Ms. Kassa; special education teacher Barry Jetton; Ms. Peña-Rivera; Ms. Osborn; Ms. Maruyama; and Ms. LaFleur. The IEP team met to discuss Student's academic progress since the November 2010 IEP. The team updated PLOPS, goals and objectives. They discussed related services, supports, and placement.

180.     Student met her OT cutting, APE object control, and her social emotional annual goals. She met some of the incremental objectives, but not the annual goals, for expressive language, pragmatics, articulation, and LAS. Student failed to meet any objectives or goals for math, reading, and writing.

181.     The team developed new PLOPs for OT, object control (APE), and behavior. The expressive language articulation PLOPs recommended continued LAS services. The reading PLOP found that Student had poor fluency, could not successfully read primer level text, and struggled to develop grade-level comprehension and vocabulary. Student was working significantly below grade level reading standards.

182.     For the writing PLOP, Student was struggling to develop grade-level spelling and paragraph writing skills. She was working significantly below grade level writing standards. For the mathematics PLOP, Student was working well below grade-level math

36

standards, even though math was a relative strength. She was struggling to develop grade-level computation skills and to understand grade level math concepts.

183. The IEP team developed new goals and objectives for reading, writing, mathematics, social-emotional, object control, cutting, expressive language, pragmatics, articulation, and LAS. The team also developed three goals, with objectives, related to behavior support.

184. The team fully discussed the BSP, providing and sharing ideas regarding the triggers and behaviors, along with strategies to modify and intervene.

185. The BSP identified off task behavior as primarily impeding Student's learning by causing lack of work production, disrupting other students, stopping instruction, losing instructional time, and having negative interaction with peers. They identified the need for a BSP as moderate, for all six hours of the school day, with low intensity. The predictors of the behavior were: disruption in routines; work level higher than Student's ability; lack of freedom to choose desirable activities; verbal directives; and internal emotional state. The IEP team identified changes in support which would remove or reduce Student's inappropriate behavior: allow completion in part; signal transitions; provide break; use preferred seating; provide personal space; create accommodated work; use high interest material; use specific supportive words; cue the Student; model behaviors; verbally praised Student; and use calm, deescalating words.

186. Teaching strategies for Student to decrease the inappropriate behaviors included: better communication skills; following schedules and routines; learning new social skills; and learning to request breaks. Reinforcement procedures included: high-fives; smiles; pats on the back; use of specific verbal praises; recognition of Student's strengths and talents; peer recognition; time on the computer; free time; preferred activities; stickers; and positive phone calls or notes to home.

187. The revised BSP specified reactive strategies regarding Student's behavior. First, Student would be reminded of the choices she has to make and the consequences for each. Second, Student would receive consistent limit setting. Third, the teacher or aide would discuss Student's choices at a neutral time, when she is calm and not experiencing anxiety. If Student did not respond to the positive prompts and then tantrums (falling to the ground, failing to transition, leaving, or striking others), a stopwatch would be used to time the duration of the event or incident. Student would lose an equal amount of free time during recess and/or lunch recess. However, she would be fed lunch and have enough time to eat without pressure. The BSP concluded by noting that the District would implement the communication log that was developed by the parent and BID, with IEP team input, by October 1, 2011.

188. The District offered that Student be placed in a SDC at Heliotrope, with a general education curriculum, for 15 hours a week. Instructional accommodations would include: small group, reteach/preteach, preferred seating, graphic organizers, shortened

assignments, and modified assignments to Student's ability level.  The District offered extended school year with transportation.  District did not offer transportation for the regular school year.  District offered related services of DIS counseling and guidance, LAS therapy, OT, and APE, for both the regular school year and ESY.

189.   Student would participate in general education for no less than 40 percent of the instructional week in science, social studies, art, physical education, field trips, assemblies and music.  Student would spend 60 percent of her time, per week, outside of general education.

190.   Mr. Campbell stated in the IEP team meeting that the Parents would not be signing and, in fact, none of his clients ever sign the IEP following the meeting.  He also informed the IEP team that Mother did not intend on accepting the placement offer, but would accept the related services.

191.   Parents did not sign the June 14, 2011 annual IEP.  The SELF advocate recorded the IEP, which took six hours.  The transcription of the audio was 189 pages in length.

192.   By letter dated June 17, 2011, Ms. Campbell wrote Heliotrope principal, Ms. Avalos, stating that Mother consented to the following portions of the June 14, 2011 annual IEP: (1) eligibility; (2) curriculum; (3) location; (4) ESY; (5) accommodations, modifications, supports; (6) regular school year and ESY related services of OT, APE, counseling, and LAS; and (7) BSP.  Mother did not consent to the following:  (1) placement in special day class; (2) District's failure to include the amount of requested BII time that was discussed in team meeting; and (3) District's failure to include one hour per month of BID that was discussed in the team meeting.  Ms. Campbell reserved all rights regarding the June 2011 IEP.

*June 24, 2011 Amendment IEP*

193.   The District convened an amendment IEP on June 24, 2011, for the sole purpose of including the BII and BID related services, for both the regular school year and ESY.  The services were inadvertently omitted in the IEP document.  By letter of June 29, 2011, Ms. Campbell consented to the additional services, but continued to reject the SDC placement.

*October 10, 2011 Amendment IEP*

194.   The District convened an amendment IEP on October 10, 2011, to confirm moving Student from a second floor classroom to general education teacher Michael Sandoval's third grade classroom on the first floor, because of safety concerns. Attending were: Mother; Father; Jim Campbell; administrator and newly assigned AP-EIS, Timothy Tobin; Ms. Coulter; Ms. Maruyama; general education teacher, A. Abarca; Ms. Kassa; Ms. Peña-Rivera; and the newly assigned BID, Elizabeth Somilleda.  The team agreed to

38

reconvene the meeting, after Student had an opportunity to adjust to the new classroom and teacher. The IEP team would then discuss how Student was adapting and evaluate her behavior. Ms. Somilleda would prepare an updated behavior PLOP and the District would conduct an inclusion evaluation. The meeting adjourned.

*Third Grade BID Services*

195.   Ms. Somilleda was assigned to be Student's BID shortly before the October 2011 IEP team meeting. Ms. Somilleda testified at the hearing. She received a bachelor of arts in sociology and, with a minor in French and government, from Cornell University in 1994. In 2011, she also earned a master's degree in education administration from Cal State – Dominguez Hills. She received a California clear education specialist credential in 2004, a cross cultural language development credential in 2006, and an administration credential in 2007.

196.   Ms. Somilleda started working for the District as a SDC special education middle school teacher, for six to seven years. She then was a dean for two and a half years, one year of which she also served as a bridge coordinator. As bridge coordinator, Ms. Somilleda scheduled IEP meetings according to legal timelines, assured presence of IEP team members, and assisted school sites in the DVR (district validation review) process, which assured that student records were up to date, properly organized, and contained all required components. She then became an AP for a year, before joining the District's BST in August 2011. Her BST duties were the same as those of the prior BID, Ms. LaFleur.

197.   As Student's BID, she reviewed all available records, assessments, IEP's, and the BSP. After the October 2011 IEP, she started to collect quantitative data to determine if Student's behavior goals were being achieved. She observed Student at class, in the yard, and during lunchtime. Once she devised the way to gather the proper data, Ms. Somilleda met with Ms. Reymundo and Mr. Sandoval. The data collection required the use of a stopwatch, over 15 minute periods, in an ABC format. Ms. Somilleda taught Ms. Reymundo how to gather and record this data. They would collect data simultaneously, thus assuring that Ms. Reymundo was precise. Ms. Somilleda gathered and charted the behavior data on a weekly basis.

198.   She continued to collect data throughout Student's third grade. She regularly shared the charted information to Mother. Ms. Somilleda's goal was to meet every two weeks but, with Mother's schedule, they met about once a month. Ms. Bunt was invited to these meetings, but never attended. Ms. Somilleda explained what the data showed about the interventions and Student's behaviors.

199.   Ms. Somilleda knew that Ms. Reymundo and Mr. Sandoval filled out a daily report for Mother, on a form devised by Mother, Ms. LaFleur, and the IEP team. However, Ms. Somilleda did not use this narrative information in her evaluation of Student's behaviors. Student's daily reports were more functional and did not provide the precise frequency and qualitative data Ms. Somilleda said was necessary to make an informed evaluation of

39

Student's behaviors.  She stated that all behavior intervention was quantitative and was not exclusive to any particular behavior methodology.

200.   Ms. Somilleda required about a month of data to determine Student's frustration baseline level for different tasks.  Comprehension was the most difficult and frustrating for Student.  With such nonpreferred tasks, she implemented a strategy using visual reinforcement and breaking down tasks into smaller steps.

201.   She held frequent meetings with Ms. Reymundo and Mr. Sandoval.  She was in Student's classroom one and a half hours per week.  She would make observational evaluation of Student's performance, making appropriate changes to the learning environment and behavioral interventions.  Ms. Somilleda scheduled to observe Student when receiving DIS services, providing opportunities to evaluate and interact outside the classroom.

202.   Ms. Somilleda developed tools for Ms. Reymundo to use in class, such as a visual schedule, behavioral reinforcement charts, and queuing and prompting charts.  She regularly modeled intervention strategies for Ms. Reymundo and Mr. Sandoval.  Ms. Somilleda used ABA strategies with Student, such as visual cuing.  An example was the use of an O ring with different prompts – look, keep going, copy, good job.

203.   She felt that she had a strong and productive working relationship with Ms. Reymundo.  Ms. Somilleda convincingly testified that Ms. Reymundo understood prompting and accurately implemented the BID strategies.  Ms. Somilleda also met with Mr. Sandoval at least two times a month during recess; he would ask questions and was amenable to any type of strategy.

204.   Ms. Somilleda gave the professional opinion that Student's behaviors did not require a BCBA aide.  The FBA clearly identified the targeted behaviors and the qualitative data indicated what strategies would work to address the behaviors.

*Inclusion Observation*

205.   Inclusion facilitator Deborah Dennis prepared a School Observation Inclusion Report in February 2012.  Ms. Dennis testified at the hearing.  She earned her bachelor of arts in economics from UCLA in 1983 and received a master's degree in special education from National University in 1985.  She obtained California clear general education and special education credentials in 1994.  She received her resource specialist (RSP) credential in 1996 and a preliminary administrative credential in about 2009.  Ms. Dennis started as a general education teacher and then worked as a District long-term substitute.  In 1993, she became a full-time District SDC teacher.  In 1998, she became a RSP teacher.

206.   Beginning in 2004, Ms. Dennis started as an inclusion facilitator, which was an itinerant RSP teacher, who went from site to site, and supported students with moderate to severe disabilities in general education classrooms.  Her duties included being the case

40

carrier for the special education student in a general education classroom, develop and implement the IEP, and collaborate with DIS providers, teachers and family. Typically, special education students still required the needs of a special education teacher in a general education classroom.

207.   Ms. Dennis evaluated Student to determine whether she would benefit from full inclusion in a general education classroom, with support of an itinerant RSP teacher. She contacted the administration and Student's teacher, and schedule times throughout the Student's day, including and especially transitions, within which to observe Student. Ms. Dennis observed Student in the classroom and on the yard on five different days in February 2012. She also interviewed Mr. Sandoval and Ms. Reymundo.

208.   Ms. Dennis noted Student's appropriate and inappropriate behaviors in her February 20, 2012 report. Her observations were quite similar to those already observed and reported by Student's BID's. Ms. Dennis listed Student's preferences, which included the use of the computer and math instruction. Student enjoyed the playground, recess and lunch, and drawing. Student sought the attention of her peers and liked praise, winning, being successful, and going first.

209.   Mr. Sandoval said that Student was very challenged with written language and associated tasks. Reading was a nonpreferred activity. Student performed more successfully in math activities, but she required support with new concepts, multiplication facts, beginning multiplication skills, decimals and fractions. Student displayed frustration when learning multiplication facts and concepts. Student demonstrated verbal refusals when presented with nonpreferred tasks, sometimes escalating into tantrums. Student's communication with peers and adults was limited; she did not initiate conversations. Student struggled expressing her wants and needs and negotiating choices within activities. Student had some friends in class, having learned the names of most classmates. Still, peer interaction was limited and she participated only if prompted. Mr. Sandoval expressed concern regarding Student's ability to access the general education curriculum without the support of special education teachers for core academics.

210.   Ms. Dennis recommended more than 30 interventions to assist Student in accessing her general education curriculum. Notably, she concluded that Student needed the support of a special education teacher, with daily instructional time in a SDC. The RSP instruction would address Student's core curriculum, with intensive instruction in the language arts. Student's general education classroom inclusion would be for general education preferred activities and in general education classes, other than reading, writing and math.

*February 28, 2012 Reconvened Amendment IEP*

211.   On February 28, 2012, the District reconvened the amendment IEP that started on October 10, 2011. Attending were: Mother; SELF advocate Wiley Campbell; Ms. Bunt; Ms. Patin; administrator Mr. Tobin; District LRE specialist, Amita Dave; Mr. Sandoval; Mr.

41

Jetton; Ms. Coulter; Ms. Maruyama; Ms. Peña-Rivera; Ms. Lynch; Ms. Dennis; and Ms. Somilleda.

212. Ms. Somilleda started the meeting by providing a summary of her data collection, Student's challenging behaviors, various tools and interventions that had been implemented, and Student's progress. Ms. Somilleda emphasized that an ongoing difficulty, and an area of significant need, was Student's behaviors when faced with tasks that were too difficult. Ms. Somilleda stated that the curriculum with which Student was working created a challenge on an ongoing basis. Ms. Somilleda reported markedly improved social skills, providing examples of Student's increasing participation of activities on the play yard. Student was engaging other children and playing by the rules, which was often difficult for autistic children. The team updated Student's behavior support PLOP and goal and revised the BSP. Ms. Somilleda expressed pride in the Student's hard work and also in Ms. Reymundo.

213. Ms. Dennis then gave a detailed and lengthy presentation of her inclusion observations, evaluation, and recommendations. Her oral report to the IEP team was more detailed than her written report. The inclusion evaluation and recommendations generated substantial discussion amongst the IEP team. Ms. Dennis determined that general education inclusion was appropriate only if Student received RSP services. In Ms. Dennis' opinion, without the services of a special education teacher, Student was not able to access her general education curriculum. Ms. Dennis offered four hours of RSP a week, which she believed would allow time to address Student's core subjects. If Student required more RSP time, then it was likely that Student needed an SDC.

214. Ms. Dennis testified that the team considered a blended, partial and full inclusion programs. She discussed different options, from SDC class, with general education mainstreaming in non-core subjects, to RSP support if Student remained in a general education classroom. In her February 20, 2012 observation report, her recommendations included intensive instruction for Student in language arts by a special education teacher. Most of the discussions concerned Student's behavior. Ms. Bunt testified that she believed the District team members did not listen to or consider Mother's concerns. Ms. Somilleda recalled that there was substantial discussion but that Ms. Bunt was primarily accusative and argumentative.

215. Ms. Patin, Ms. Bunt, Mother, and the advocate focused on the behavioral interventions and Student's alleged behavioral regression. Generally, Mother contended that the reason Student could not do her academics was because the District was not providing proper behavior services. Mother, Ms. Bunt, and Ms. Patin said that Ms. Reymundo was inadequately trained, incorrectly used strategies and prompts, and generally lacked understanding of ABA. They requested a BCBA BII.

216. At hearing, Ms. Bunt testified that Ms. Reymundo was not qualified to be an aide to an autistic child. Ms. Bunt, though she admittedly had never observed Student in the District general education class, believed that Ms. Reymundo was not competent because she

42

did not understand behavior intervention and did not employ the strategies that were in the IEP's. Ms. Bunt stated that Ms. Reymundo did not understand ABA, prompting, or the concept of ABC. Ms. Bunt testified that the main methods for teaching autistic children were ABA, DTT,[9] and Floortime.[10] She asserted that District used none of these methods with Student. In her opinion, consistency was necessary for the autistic child and the District's methods were inconsistent in school and conflicted with the behavioral intervention Student was receiving from her and others. She claimed that the District BII regularly reinforced negative behaviors, primarily because there were no negative consequences. Ms. Bunt testified that Student's negative behaviors increased and her academic performance regressed because of District's inconsistent and inept behavior intervention.

217.   Ms. Somilleda and Ms. Dennis were both concerned that there was little discussion of Student's academics. Both testified that behavior intervention alone would not enable Student to access her general education curriculum. Ms. LaFleur, Ms. Somilleda, Ms. Choe, Ms. Dennis, Ms. Sandoval, and Ms. Peña-Rivera all testified that, in their professional opinions, a general education classroom was not an appropriate full-time placement for Student, who required the services of a special education teacher to access her core curriculum. Ms. Dennis suggested RSP pull out to the IEP team, but noted that RSP might still prove insufficient and that SDC placement would be appropriate. The suggestion that Student be provided RSP was rejected by Mother and Ms. Patin.

218.   The IEP meeting took a break. Mother, Ms. Bunt, Ms. Patin, and Wiley Campbell met in private and returned to the meeting, requesting placement in a nonpublic school. The IEP's notes stated that a comprehensive assessment plan would be offered to address Mother's concern over placement. The IEP team agreed that Ms. Somilleda would work with Ms. Reymundo on the daily report and that any changes to the behavior log would be done collaboratively. Behavioral team meetings were to be scheduled to address Parents' concerns.

219.   In the February 2012 amended IEP, District offered that Student be placed in a general education class at Heliotrope, with a general education curriculum. Instructional accommodations would include: small group, reteach/preteach, preferred seating, graphic organizers, shortened assignments, and modified assignments to Student's ability level. The District did not offer ESY. District did not offer transportation. District offered related services of DIS counseling and guidance, LAS therapy, OT, APE, BII and BID. District's offer did not include any inclusion services, or RSP.

---

[9] DTT is a format for ABA training.

[10] Floortime is a comprehensive, interdisciplinary approach that focuses on the emotional development of the child.

43

220.    Parents did not sign and consent to the IEP.  District prepared and faxed an assessment plan to SELF on April 17, 2012.  Mother said she was aware of the assessment plan, but did she did not sign and return it.  The District therefore could not proceed with any further assessment of Student.

221.    Mother testified that she did not believe her IEP participation was meaningful because her suggestions were not accepted or incorporated by the District IEP team members.

*Student's Third Grade Behaviors*

222.    Mr. Sandoval testified at the hearing.  He received a bachelor of arts in 1989 from UCLA and his teaching credential in 1993.  He had been a general education teacher with at Heliotrope for 21 years, teaching every elementary grade, but mostly third.

223.    Student came to his third grade general education classroom in early October 2011 when she was moved from the second floor classroom.  Mr. Sandoval reviewed Student's IEP and BSP.  During the first few months, into December 2011, Student exhibited aggressive behaviors toward Ms. Reymundo.  Student would hit Ms. Reymundo's arm or forehand about once a week.  He does not recall Student hitting, striking, pushing, or slapping anyone else, including himself.

224.    Student required constant prompting from Ms. Reymundo.  Student caused distractions in the classroom by speaking loudly to herself, getting out of her seat and jumping across the room, or screaming wildly, on the average of twice a week. These incidents could last from a few minutes to more than an hour.  Mr. Sandoval does not recall Student running away. He had seen her fall to the ground and tantrum, refusing to get up.

225.    Mr. Sandoval was responsible for reviewing Student's daily reports, which were typically completed by Ms. Reymundo.  The forms were usually completed the same day, and provided to Mother. Generally, Mr. Sandoval and Ms. Reymundo would indicate how Student was doing in the classroom, noting both positive and disrupting behaviors.  Mr. Sandoval believed that Ms. Reymundo was very good with Student in both addressing and minimizing negative behaviors, though sometimes Student was simply out of control and needed time to calm.

226.    Student received breaks as part of her behavior strategy. When Student was frustrated, she would get loud and start screaming; a break would give her time to calm herself.  Mr. Sandoval did not believe that a break was awarding Student for negative behavior. Student could not work if she were upset and frustrated.  Breaks were timed to be five minutes long.  Student received, on average, two breaks a day. When Student was on a break, she would not be participating classwork.

227.    One of the daily reports, in May 2012, seemed to indicate that Student was offered a snack when being disruptive. Mr. Sandoval testified that Student was never given or offered a snack for misbehaving.

228.    At times, Students would have to finish her class work at home because she was unable to complete the work during the time allotted. A card changing system was used as a means of behavior control for the whole class; Student participated in the card changing system at the beginning of the year. Since then, the card system was not used with Student. References to cards in later daily reports had to do with cueing cards. Student had her own strategies that Ms. Somilleda developed and implemented for more positive behavior. Ms. Somilleda was very helpful to Mr. Sandoval in providing training and guidance.

229.    Mr. Sandoval determined that Student was unable to meet third grade level standards. The third-grade curriculum was very challenging, introducing new concepts and skills on a regular basis, particularly in math, moving at a pretty fast pace. In reading and language arts, the stories were longer with more difficult vocabulary. In accordance with the IEP accommodations, Mr. Sandoval would try to modify some of the assignments in terms of difficulty. For example, he would lower the number of problems for Student to complete from 15 to 10.

230.    Student's behaviors became more difficult, beginning in May 2012. The California standardized tests (CST) were administered for a two-week period in mid-May. Pursuant to Student's IEP, she took these tests, but in the quiet of the resource room. Student became increasingly frustrated when reviewing for the CST. Mr. Sandoval concluded that Student became overwhelmed. He observed Student work on practice math word problems. After reading the first sentence, she pounded the desk and demanded to go home.

231.    On May 10, 2012, while in the process of attending to Student after a tantrum, Student announced that she was going to go home. Thinking that she might try to run, Mr. Sandoval stood in the way of her moving. Student tried to hit Mr. Sandoval but Ms. Reymundo intervened. Student seemed to calm down and returned to her desk. She retrieved a pencil she had dropped. Mr. Sandoval went to Student's desk and explained that her conduct was unacceptable. Student suddenly lunged at Mr. Sandoval and punctured him in the stomach with the pencil. This was the only time Student had ever hit Mr. Sandoval. Ms. Reymundo called the principal, so an appropriate report could be made. Student was not allowed to leave the class when other students were dismissed. She wrote a required apology letter. Mother also apologized, which Mr. Sandoval appreciated. Mr. Sandoval saw a doctor and his wound healed without medical intervention.

232.    Mr. Sandoval testified that Student made slight academic progress in the areas in which she showed interest, such as writing, spelling (a strength), and simple computation skills. Mr. Sandoval believed that Student should not be placed in a general education classroom because the third-grade curriculum overwhelmed her, especially in language arts and comprehension.

45

LEGAL CONCLUSIONS

1.    In a special education administrative due process hearing, the party seeking relief has the burden of proving the essential elements of its claim. (*Schaffer v. Weast* (2005) 546 U.S. 49, 56-62 [126 S.Ct. 528, 163 L.Ed.2d 387].) In this matter, the Student has the burden of proof.

*Issues One and Seven – Appropriate Placement*

2.    In Issue One, Student contends she was denied a FAPE during the 2010-2011 school year because District did not provide her with an appropriate placement. In Issue Seven, Student similarly contends District deprived her of a FAPE by not offering an appropriate placement for the 2011-2012 school year. Specifically, Student contends District failed to provide an appropriate placement from September 2010 to June 2011 (Issue One) and from September 2011 to May 2012 (Issue Seven) because District acknowledged by its offer of an SDC and its disagreement with Parent's request for a general education placement that the general education classroom placement was inappropriate. District acknowledged that the general education classroom placement was inappropriate and, therefore, District failed to provide FAPE. District contends, and the evidence convincingly establishes, that it offered an appropriate placement, but Mother's refusal to consent prevented District from implementing and providing a FAPE.

3.    Under the Individuals with Disabilities Education Act (IDEA) and state law, children with disabilities have the right to a FAPE. (20 U.S.C. § 1400(a); 34 C.F.R. § 300.101 (2006); Ed. Code, § 56000.) A FAPE means special education and related services that are available to the special needs pupil at no charge to the parents, that meet state educational standards, and that conform to the child's IEP. (20 U.S.C. § 1401(a)(9); 34 C.F.R. § 300.17 (2006); Cal. Code Regs., tit. 5, § 3001, subd. (p).) "Special education" is instruction specially designed to meet the unique needs of a child with a disability. (20 U.S.C. § 1401(a)(29); 34 C.F.R. § 300.39 (2006); Ed. Code, § 56031, subd. (a).) Specially designed instruction also includes accommodations that address a child's unique needs and that ensure access to the general curriculum. (34 C.F.R. § 300.39(b)(3) (2006).) "Related services" are developmental, corrective and support services that are required to assist a special needs pupil to benefit from special education. (20 U.S.C. § 1401(a)(26); 34 C.F.R. § 300.34(a) (2006); Ed. Code, § 56363, subd. (a).) In California, related services are called designated instruction and services (DIS).

4.    The IEP is the "centerpiece of the [IDEA's] education delivery system for disabled children" and consists of a detailed written statement that must be developed, reviewed, and revised for each child with a disability. (*Honig v. Doe* (1988) 484 U.S. 305, 311 [108 S.Ct. 592, 98 L.Ed.2d 686]; 20 U.S.C. §§ 1401 (14), 1414 (d)(1)(A); Ed. Code, §§ 56032, 56345.) In developing the IEP, the IEP team shall consider the strengths of the child, the concerns of the parents for enhancing the education of their child, the results of the initial

46

evaluation or most recent evaluation of the child, and the academic, functional and developmental needs of the child. (20 U.S.C. § 1414(d)(3)(A).)

5.      Each school district is required to initiate and conduct meetings for the purpose of developing, reviewing, and revising the IEP of each individual with exceptional needs. (34 C.F.R. § 300.343, Ed. Code, § 56340.) Parents are required and vital members of the IEP team. (20 U.S.C. § 1414(d)(1)(B)(i); 35 C.F.R. § 300.344(a)(1); Ed. Code, § 56341, subd. (b)(1).) The IEP team must consider the concerns of the parents for enhancing their child's education throughout the child's education. (20 U.S.C. § 1414(c)(1)(B) [during assessments], (d)(3)(A)(i) [during development of the IEP], (d)(4)(A)(ii)(III) [during revision of an IEP]; Ed. Code, § 56341.1, subds. (a)(1) [during development of an IEP], (d)(3) [during revision of an IEP], & (e) [right to participate in an IEP].) The requirement that parents participate in the IEP process ensures that the best interest of the child will be protected, and acknowledges that parents have a unique perspective on their child's needs, since they generally observe their child in a variety of situations. (*Amanda J. ex rel. Annette J. v. Clark County School Dist.* (9th Cir. 2001) 267 F.3d 877, 891.)

6.      A pupil must be assessed in all areas related to the suspected disability, prior to the development of an IEP. (Ed. Code, § 56320, subds. (f)). A school district is required to use the necessary assessment tools to gather relevant functional and developmental information about the child to assist in determining the content of the child's IEP. (34 C.F.R. § 300.304(b)(1)(ii) (2006); Ed. Code, § 56320, subd. (f).) A school district is also required to ensure that the evaluation is sufficiently comprehensive to identify all of the child's needs for special education and related services. (34 C.F.R. § 300.304(c)(6) (2006); Ed. Code, § 56320, subd. (f).)

7.      Individually administered tests of intellectual or emotional functioning shall be administered by a credentialed school psychologist.  Tests and other assessment materials must be used for purposes for which the assessments or measures are valid and reliable. (Ed. Code, § 56320, subds. (b)(2) &(b)(3).)

8.      Assessments must be conducted by qualified persons who are knowledgeable of the student's disability, who are competent to perform the assessments, as determined by the local educational agency, and who give special attention to the student's unique educational needs, including, but not limited to, the need for specialized services, materials, and equipment. (Ed. Code, §§ 56320, subd. (g), & 56322.)  "The assessment shall be conducted by persons competent to perform the assessment, as determined by the local educational agency." (Ed. Code, § 56322.)

9.      The personnel who assess the student must prepare a written report of the results of each assessment, and provide a copy of the report to the parent. (Ed. Code, §§ 56327 and 56329.) The report shall include, but not be limited to, the following: (1) whether the student may need special education and related services, (2) the basis for making the

47

determination, (3) the relevant behavior noted during the observation of the student in an appropriate setting, (4) the relationship of that behavior to the student's academic and social functioning, (5) the educationally relevant health and development, and medical findings, if any, (6) a determination concerning the effects of environmental, cultural, or economic disadvantage, where appropriate, and (6) the need for specialized services, materials, and equipment for students with low incidence disabilities. (Ed. Code, § 56327.)

10.    In *Board of Education of the Hendrick Hudson Central School District v. Rowley* (1982) 458 U.S. 176, 201 [102 S.Ct. 3034, 73 L.Ed.2d 690] (*Rowley*), the United States Supreme Court addressed the level of instruction and services that must be provided to a pupil with a disability to provide a FAPE. The Court determined that a student's IEP must be reasonably calculated to provide the student with some educational benefit, but that the IDEA does not require school districts to provide the student with the best education available or to provide instruction or services that maximize a student's abilities. (*Id.* at pp. 198-200.) The Court stated that school districts are required to provide a "basic floor of opportunity" that consists of access to specialized instructional and related services that are individually designed to provide educational benefit to the student. (*Id.* at p. 201; *J.L. v. Mercer Island School District* (9th Cir. 2009) 575 F.3d 1025, 1034, 1037-1038 & fn. 10 (*Mercer Island*).)

11.    There is no one test for measuring the adequacy of educational benefits conferred under an IEP. (*Rowley, supra*, 458 U.S. at pp. 202, 203 fn. 25.) A student may derive educational benefit under *Rowley* if some of his goals and objectives are not fully met, or if he makes no progress toward some of them, as long as he makes progress toward others. A student's failure to perform at grade level is not necessarily indicative of a denial of a FAPE, as long as the student is making progress commensurate with his abilities. (*Walczak v. Florida Union Free School District* (2nd Cir. 1998) 142 F.3d 119, 130 (*Walczak*); *E.S. v. Independent School Dist., No. 196* (8th Cir. 1998) 135 F.3d 566, 569; *In re Conklin* (4th Cir. 1991) 946 F.2d 306, 313; *El Paso Indep. School Dist. v. Robert W.* (W.D.Tex. 1995) 898 F.Supp.442, 449-450.)

12.    Under *Rowley*, the factual showing required to establish that a student received some educational benefit is not demanding. For a student in a mainstream class, "the attainment of passing grades and regular advancement from grade to grade are generally accepted indicators of satisfactory progress." (*Walczak, supra*, 142 F.3d at p. 130.) A district need not guarantee that a student will make a month's academic progress in a month's instruction; a student may benefit even though his progress is far less than one grade level in one school year. (See, e.g., *Houston Indep. Sch. Dist. v. Bobby R.* (5th Cir. 2000) 200 F.3d 341, 349 n.3.) A two-month gain in reading in 10 instructional months has been held an adequate showing. (*Delaware Valley Sch. Dist. v. Daniel G.* (Pa. Cmwlth. 2002) 800 A.2d 989, 993-94.) A student derives benefit under *Rowley* when he improves in some areas even though he fails to improve in others. (See, e.g., *Fort Zumwalt Sch. Dist. v. Clynes* (8th Cir. 1997) 119 F.3d 607, 613; *Carlisle Area School v. Scott P* (3d Cir. 1995) 62 F.3d 520, 530.)

48

He may derive benefit while passing in four courses and flunking in two. (*Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.* (S.D.Tex. 1995) 931 F.Supp. 474, 481.)

13.     Progress may be found even when a student's scores remain severely depressed in terms of percentile ranking and age equivalence, as long as some progress toward some goals can be shown. (*Coale v. Delaware Dept. of Educ.* (D.Del. 2001) 162 F.Supp.2d 316, 328.) Whether a student has received more than *de minimis* benefit must be measured in relation to the student's potential. (*Mrs. B. v. Milford Bd. of Educ.* (2d Cir. 1997) 103 F.3d 1114, 1121; *Polk v. Central Susquehanna Intermediate Unit 16* (3d Cir. 1988) 853 F.2d 171, 185.)

14.     In resolving the question of whether a school district has offered a FAPE, the focus is on the adequacy of the school district's proposed program. (See *Gregory K. v. Longview School District* (9th Cir. 1987) 811 F.2d 1307, 1314 (*Gregory K*).) A school district is not required to place a student in a program preferred by a parent, even if that program will result in greater educational benefit to the student. (*Ibid.*) Nor must an IEP conform to a parent's wishes in order to be sufficient or appropriate. (*Shaw v. Dist. of Columbia* (D.D.C. 2002) 238 F.Supp.2d 127, 139.) For a school district's offer of special education services to a disabled pupil to constitute a FAPE under the IDEA, a school district's offer of educational services and placement must be designed to meet the student's unique needs and be reasonably calculated to provide some educational benefit in the least restrictive environment. (*Ibid.*)

15.     To determine whether a pupil was denied a FAPE, an IEP must be examined in terms of what was objectively reasonable at the time it was developed, not in hindsight. (*Adams v. State of Oregon* (9th Cir. 1999) 195 F.3d 1141,1149; *Roland M. v. Concord Sch.* (1st Cir. 1990) 910 F.2d 983, 992.)

16.     School districts must have available a continuum of program options to meet the needs of individuals with exceptional needs for special education and related services as required by the IDEA and related federal regulations. (Ed. Code, § 56360.) The continuum of program options includes, but is not limited to regular education programs; resource specialist programs; designated instruction and services, including, speech and language, adapted physical education and occupational therapy; special classes such as special day classes; nonpublic schools; and instruction in the home, hospitals or other institutions. (Ed. Code, § 56361.) There is no requirement that the IEP team discuss all possible choices on the continuum of program options at the IEP team meeting.

17.     School districts are required to provide each special education student with a program in the least restrictive environment. A special education student must be educated with "non-disabled peers "to the maximum extent appropriate," and may be removed from the general education environment only when the nature or severity of the student's disabilities is such that education in general education classes with the use of supplementary aids and services "cannot be achieved satisfactorily." (20 U.S.C. § 1412 (a)(5)(A); 34 C.F.R. § 300.114(a)(2)(ii)(2006).) To determine whether a special education student could be

satisfactorily educated in a regular education environment, the Ninth Circuit Court of Appeals has balanced the following factors: 1) "the educational benefits of placement full-time in a regular class"; 2) "the non-academic benefits of such placement"; 3) the effect [the student] had on the teacher and children in the regular class"; and 4) "the costs of mainstreaming [the student]." (*Sacramento City Unified School Dist. v. Rachel H.* (9th Cir. 1994) 14 F.3d 1398, 1404 (*Rachel H.*) [adopting factors identified in *Daniel R.R. v. State Board of Ed.* (5th Cir. 1989) 874 F.2d 1036, 1048-1050]; see also *Clyde K. v. Puyallup School Dist. No. 3* (9th Cir. 1994) 35 F.3d 1396, 1401-1402.) If it is determined that a child cannot be educated in a general education environment, then the LRE analysis requires determining whether the child has been mainstreamed to the maximum extent that is appropriate in light of the continuum of program options. (*Daniel R.R. v. State Board of Ed., supra,* 874 F.2d at p. 1050.)

18.     A special education student must be educated with nondisabled peers "[t]o the maximum extent appropriate," and may be removed from the regular education environment only when the nature or severity of the student's disabilities is such that education in regular classes with the use of supplementary aids and services "cannot be achieved satisfactorily." (20 U.S.C. § 1412(a)( 5)(A); 34 C.F.R. § 300.114(a)(2)(i) & (ii) (2006); Ed. Code, § 56364.2, subd. (a).)

19.     In the case of a child whose behavior impedes his or her learning or that of others, the IEP team must consider, when appropriate, "strategies, including positive behavioral interventions, strategies, and supports to address that behavior." (20 U.S.C. §1414(d)(3)(B)(i); 34 C.F.R. § 300.324 (2006); Ed. Code, § 56341.1, subd. (b)(1).) California law defines behavioral interventions as the "systematic implementation of procedures that result in lasting positive changes in the individual's behavior," including the "design, implementation, and evaluation of individual or group instructional and environmental modifications . . . designed to provide the individual with greater access to a variety of community settings, social contacts and public events; and ensure the individual's right to placement in the least restrictive environment as outlined in the individual's IEP." (Cal. Code Regs, tit. 5, § 3001, subd. (e).) This type of behavioral intervention is referred to as a BSP in California, although there is no statute or regulation that uses that term.

20.     If a parent consents in writing to special education and related services but does not consent to all of the components of the IEP, the school district shall implement those components to which the parent consented so that the child's instruction and services are not delayed. (Ed. Code, § 56346, subd. (e).) If the school district determines that the component of the IEP to which the parent does not consent is necessary to provide a FAPE to the child, a due process hearing shall be initiated. (Ed. Code, § 56346, subd. (f).)

21.     Here, Student failed to meet her burden of proof that District failed to provide Student with a FAPE because it allowed Student to remain in the general education classroom for second grade (Issue One) and third grade (Issue Seven). Student seeks to hold

District liable for not filing a due process request, which, had District prevailed, would have forced Mother to forfeit the general education placement that she and her counsel maneuvered to preserve.  Phrased another way, Student now contends she was denied a FAPE because Mother's preferred placement, in hindsight, is no longer Mother's preferred placement.  This paradoxical argument is unpersuasive.  In determining if District offered a FAPE, the focus in on the adequacy of District's proposed program, not whether District filed a request for a due process hearing to override Mother's lack of consent to District's proposed program.

22.     When Student returned to the District in September 2010 and enrolled at Heliotrope, Mother provided a copy of a 2006 District IEP, which found Student eligible and offered related services in an SDC.  Mother had never consented to that IEP.  More than four years later, after enrolling Student at Heliotrope, Mother's attorneys suddenly stated she consented to the 2006 IEP's eligibility and related services, but not SDC placement.

23.     Heliotrope principal Ms. Avalos logically responded that the District could not implement those portions of the 2006 IEP to which Mother consented because the assessments that formed the basis for the services were more than four years old and unreliable.  Mother also indicated there had been an intervening placement and services not provided by District, further demonstrating that a four-year-old IEP for a young developing child could not be considered to be a FAPE.[11]

24.     Based upon Mother's concerns for Student's safety and behavior needs, District agreed to administratively place Student in a general education classroom with an aide.  District prepared an assessment plan, which Mother signed and returned on September 13, 2010, and the District proceeded to timely and thoroughly assess Student.  A 30-day IEP was held on October 13, 2010, at which eligibility was affirmed.  Student was allowed to remain in the general education classroom placement until the assessment were completed and presented at an IEP meeting.

25.     The District reasonably and properly determined that the provision of the 2006 IEP related services, without knowledge of Student's educational and special needs history and without recent assessments, would violate its duty to fully assess a student before developing and implementing an IEP.  (Ed. Code, § 56320, subds. (f).)  The District's administrative placement, with a 30-day IEP, properly addressed Mother's concerns.  (Factual Findings 2-30.)

---

[11] Ms. Avalos said District was having difficulty obtaining Student's records and requested Mother's or her attorney's assistance.  Neither Mother nor her attorney helped obtain Student's records and, thus, there was no documentary evidence of Student's education before 2010.

26.     Ms. Peña-Rivera was an experienced, licensed educational psychologist, whose credentials qualified her to conduct Student's psychoeducational assessment and evaluation. Her November 2010 report reflected a thoughtful choice of standardized, valid and reliable instruments to assess and measure Student's intellectual and emotional functioning. The assessment was appropriate.

27.     Mother's belief that Student was performing at grade level and capable of learning in a general education classroom was not supported by the psychoeducational assessment's standardized tests or Student's classroom work. Ms. Valles reported that Student had difficulty with reading, decoding, and comprehension. Ms. Peña-Rivera determined that Student struggled in her ability to learn. Student's WJII scores were below average for reading decoding, comprehension, writing fluency, and spelling. Her CAS scores were below average for the verbal-spatial processing subtest and well below the average range for successive processing subtests.  Student's WRAML Verbal Memory index was well below average and her Attention and Concentration index and General Memory index were below average. Student's overall C-TOPP Phonological Memory skills were in the low average range, which could constrain the Student's ability to learn new written and spoken vocabulary. Student's C-TOPP Rapid Naming subtest scores were well below average, which meant that Student would have difficulty reading fluently.

28.     Ms. Peña-Rivera concluded that Student had three areas of cognitive weaknesses – auditory processing and short-term memory, processing speed, and association, especially in Student's ability to store and retrieve information in long-term memory.  To access a general education curriculum, Student required a special education teacher with the training and skills to present information and concepts in a manner that would meet Student's unique learning needs. Ms. Peña-Rivera persuasively testified that, without such special education teaching, Student would be overwhelmed by the demands of the general education classroom, growing anxious and frustrated, which contributed to Student's difficult behaviors. (Factual Findings 40-78.)

29.     At the November 9, 2010 IEP, District offered Student placement in an EE class, with a general education curriculum. Mother did not want SDC.  She and her advisors requested a general education placement with a full-time behaviorist and would not consent to anything else. Both Ms. Peña-Rivera and Ms. Choe testified that such a placement was more restrictive that a small SDC class because Student could be more independent in the smaller class. Mother, through legal counsel, did not accept the placement, but consented to the related services. Student remained in the general education classroom with a fulltime aide. (Factual Findings 80-112.)

30.     At the March 1, 2011 IEP, Ms. Peña-Rivera presented Student's FBA.  The IEP team offered fulltime BII and 15 hours of BID, in an EE SDC. Again, Mother rejected the placement in the SDC but consented to the related services, including BII and BID. Mother rejected District's SDC offer at the IEP's of April 12, 2011, May 9, 2011, June 14, 2011, June 24, 2011, and October 10, 2011, though the IEPs provided general education

52

inclusion for activities and classes that were not core curriculum. (Factual Findings 113-140, 141-153, 176-194.)

31.    Student did not offer any evidence that Ms. Peña-Rivera's psychoeducational assessment was inappropriate, that the standardized test results were invalid, or that the teachers' inaccurately reported Student's performance as below grade level.  Student did not provide any standardized test results, grade reports, or work samples, which demonstrated that Student could meet grade-level performance standards for the California core curriculum.

32.    Ms. Bunt stated that at her BEST school, with her or her employee as Student's behavior specialist, Student had been fully included in a first grade class, completing her assignments, and performing at grade level in all her core classes.  Her testimony was unpersuasive.  Ms. Bunt's "first grade class" was actually an after school program with first grade students.  The teacher was not credentialed for special or general education.  With Student, Ms. Bunt did not use the California DOE standardized core curriculum, did not administer standardized tests, and did not give Student a grade report. Additionally, since the general education students were not taking first grade in Ms. Bunt's class, Student was not required to meet the performance demands and pace of a public general education class full of general education students being taught a standardized curriculum by a credentialed teacher.  Mother also testified to her belief that Student could perform at grade level in a general education classroom, but her testimony revealed that her belief was primarily based upon the counsel of Ms. Bunt and the behavior therapist, Ms. Patin. (Factual Findings 6-20.)

33.    Ms. Valles, Mr. Sandoval, Ms. Choi, Ms. LaFleur , Ms. Somilleda and Ms. Dennis all convincingly testified that the general education classroom's academic demands caused Student to be frustrated and anxious, contributing to her outbursts, aggression, and difficult behaviors.  The evidence established that despite the above, with District services, Student's social behaviors improved; she was able to engage fellow students on the yard and, using some of Ms. Somilleda's strategies, became a more included member of the class. However, when asked to perform a classroom assignment, especially in language arts, Student could quickly unravel, finding the assignment too difficult to complete in the time allotted, if at all. (Factual Findings 30-37, 40-79, 81-83, 93-94, 97-99, 103, 106-107, 113-126, 134-137, 142-145, 149, 154-164, 173-174, 181-187, 195-201, 206-210, 212-217, 222-232.)

34.    Since Mother consented in writing to related services but did not consent to the placement component of the Student's IEP, the District was required to implement those components to which Mother consented. (Ed. Code, § 56346, subd. (e).)  California law states that a school district shall initiate a due process, if it determines that the component to which a parent does not consent is necessary to provide a FAPE (Ed. Code, § 56346, subd.

(f).),[12] However, Student cites no authority that a district is liable for not providing a FAPE if it does not initiate due process.

35.    Focusing on the adequacy of District's proposed program, the evidence establishes that District offered FAPE. District assessed Student in all areas of suspected disability, conducted numerous IEP meetings, discussed various alternative placements, and adjusted services to meet the demands of Mother and her advocates. District continued to offer SDC placement for Student's core general education curriculum because the assessments and evaluations established that Student needed a special education teacher. District's offer of educational services and placement was designed to meet Student's unique needs and was reasonably calculated to provide educational benefit to Student in the LRE. The only reason District could not fully implement the FAPE was because Mother did not consent. District offered a FAPE for both the 2010-2011 and 2011-2012 school years. (Factual Findings 6-232; Legal Conclusions 1-34.)

*Issue Five - District Provided Student with a Competent Aide*

36.    In Issue Five, Student contends that the District denied her a FAPE by failing to provide a qualified adult assistant in its offers developed at the October and November of 2010 IEP's. Specifically, Student contends that District's adult assistant should have had more education and training and was not properly implementing Student's behavior services. District contends it could not offer related services at the October 2010 IEP because it did not have recent or reliable assessments and had no records or information regarding Student's schooling and services since 2006. Further, District did not offer BII and BID at the November 2010 because the psychoeducational assessment indicated that Student required special education teaching and, therefore, District offered placement in an EE SDC, where Student would not require an aide. Further, after completing an FBA, District did offer BII and BID with the SDC placement at the March 2011 IEP. When Mother refused SDC placement, but consented to the BII and BID, District implemented the BID and provided an adequately trained and competent BII aide to implement the behavior intervention strategies. As discussed below, Student failed to prove, by a preponderance of the evidence, that District did not provide Student with a competent aide, denying Student a FAPE.

37.    Legal Conclusions 1 to 35, are incorporated by reference.

38.    Student's 2006 IEP did not offer an aide. District administratively provided an aide to Student when Mother enrolled her in September 2010 because of Mother's expressed concerns regarding Student's safety and behavior, not because District believed Student was entitled to an aide as a related service. As of the October 2010 IEP, District did not possess any prior IEP's or assessments that would authorize the related service of an aide or BII. As discussed in the analysis of Issues One and Seven, above, without the assessments and

---

[12] Student incorrectly stated in her final brief that IDEA required a school district to file in such situations. The IDEA has no such statute or regulation.

54

evaluations, District was legally unable to set goals and provide the 2006 related services because the assessments had not been completed, though they were being timely pursued. (Legal Conclusions 2-25.) Similarly, without assessments which indicated Student needed an aide to access her curriculum, District could not offer an aide or BII as a related service at the October 2010 IEP. Therefore, the District did not deny Student a FAPE by not providing an aide or BII as a related service in the October 2010 IEP.

39.     The IDEA requires that special education and related services be provided by qualified personnel. (20 U.S.C. § 1412(a)(14).) The IDEA defines the term "qualified personnel" as personnel who are appropriately and adequately prepared and trained, and who possess the content knowledge and skills to serve children with disabilities. (*Id.*; 34 C.F.R. § 300.156(a).)

40.     The methodology to implement an IEP, including IEP's for pupils with autism, is left to the school district's discretion so long as it meets a pupil's needs and is reasonably calculated to provide some educational benefit to the child. (See *Rowley, supra,* 458 U.S. at p. 208; *Adams, supra,* 195 F.3d at p. 1149; *Pitchford v. Salem-Keizer Sch. Dist.* (D. Or. 2001) 155 F.Supp.2d 1213, 1230-32; *T.B. v. Warwick Sch. Comm.* (1st Cir. 2004) 361 F.3d 80, 84.) The Education Department has advised that "there is nothing in the [IDEA] that requires an IEP to include specific instructional methodologies." (Assistance to States for the Education of Children With Disabilities and Preschool Grants for Children With Disabilities, 71 Fed.Reg. 46540, 46665 (Aug. 14, 2006) (Comments on 2006 Regulations).) This principle extends to behavior services as well, as the regulations implementing the IDEA do not require that any particular methodology, strategy or technique be used to develop a behavior support or intervention plan for pupils. (71 Fed. Reg. 46683 (Aug. 14, 2006).)

41.     In essence, Student contends that Student was denied a FAPE because the BII personnel provided by District did not have the training that Student's expert, Ms. Bunt, believed was required. Student asserts that Ms. Bunt is a behavior specialist, with a master's degree, trained in ABA under the tutelage of Dr. Lovass, with years of experience working with autistic children. She worked with Student and was intimately aware of effective behavior intervention methods. Considering Ms. Bunt's education, expertise, and personal insight, Student argues that her opinions regarding Student's behavior intervention should be given primary, if not exclusive, weight. Student asserts that the District's personnel were not sufficiently educated and trained to provide insightful and persuasive testimony regarding Student's behaviors. (Factual Findings 6-13.)

42.     Contrary to Student's contention, the evidence showed District personnel were highly qualified, with similar years of experience and advanced degrees in education. Ms. Peña-Rivera's experience, credentials and education qualified her as an expert in school psychology and in the administration and interpretation of standardized instruments and psychoeducational assessments, with a PPS credential. Ms. Choe had two masters' degrees and held credentials in elementary teaching, Korean bilingual, language development specialist, administrative service, and reading. Ms. LaFleur's degree was in science and

55

education, with credentials in general education, early childhood, early reading, multiple subject, and special education, and she had been a SDC teacher for learning disabled children since 1994. Ms. Somilleda possessed a master's degree in education, with credentials in cross cultural language development, education specialist, and administration. (Factual Findings 40, 81-83, 142-144, 195-196.)

43.     The persuasive and evidentiary weight of witness testimony is not a simple comparison of curricula vitae, but an appraisal. Is the witness convincing and credible? Do the opinions withstand scrutiny? Here, Ms. Bunt's testimony was often unfocused and unclear. Her testimony regarding Student's grade level performance in a first grade classroom was, upon further inquiry, unconvincing. (See Finding of Fact 14-18.) Her testimony regarding methodology and the requisite education and credentialing of a BII aide was similarly unpersuasive.

44.     Ms. Bunt testified that Student required consistency in ABA behavior intervention, without confusing variances. She testified and argued in IEP meetings that Student must have negative consequences for negative behaviors and never be rewarded for avoiding tasks. For example, she and Ms. Patin urged that Student be denied recesses, which alarmed IEP administrator Mr. Eaton, who was concerned Student would not have time to eat lunch. (Student Exh. 39, p. 893.) Her assertion that Student would only respond to ABA methodology, and not other behavior interventions, was implausible. Ms. LaFleur testified that the District viewed various behavioral modification methodologies to be a "tool belt" of strategies to be used in addressing a child's unique behavior needs. (Factual Findings 14-18, 118, 146, 148, 150-151, 214-216.)

45.     Two situations illustrate how the ABA-only behavior intervention proposed by Ms. Bunt and Ms. Patin, and adopted by Mother, did not adequately address Student's behavior intervention needs in a general education classroom. First, the issue of providing Student breaks was often discussed. Ms. Bunt argued that the use of breaks rewarded Student for her bad behavior and encouraged Student to act out because she would then receive a break, which Student liked. Both of Student's BID's and teachers determined that Student needed to be given a break, usually five minutes in length, when Student was becoming anxious and frustrated. Ms. Reymundo was trained to monitor Student and to provide a break if it appeared that Student was about to have a tantrum and be aggressive. Student would then have time to gather herself, calm down, and then return to the task. Additionally, despite Ms. Bunt's objections, the Student's BSP specifically allowed for breaks to prevent Student's tantrum and disruptive behavior. Mother consented to implementation of the BSP. (Factual Findings 37, 77, 97-98, 124-125, 134, 148, 154-155, 171-172, 185-186, 226.)

46.     The second illustration was Ms. Bunt's and Mother's insistence that Student complete her class assignments in class. Mother testified that one of the reasons she believed Ms. Reymundo ineffective was because Student would bring unfinished class assignments home to complete. She said that when Student was in Ms. Bunt's class, she always had to

56

complete her class assignment. Otherwise, she could not do a preferred task. Ms. Bunt similarly testified that allowing Student not to complete a class assignment was rewarding Student for her avoidance behavior. However, Ms. Bunt's opinion was not persuasive because she never observed Student in her second or third grade general education classroom. (Factual Findings 56, 62, 120-126, 133-134, 154-157, 229.)

47.     In the classroom, the teacher taught the curriculum at a pace that required the general education students to learn and practice new concepts, and complete class assignments, within given timeframes. Once the timeframe passed, teacher and students moved on to the next subject or assignment. Both Ms. Valles and Mr. Sandoval testified that if Student could not complete a class assignment within the allotted time, either because it was too difficult or because her behaviors distracted her for too long, the class afforded no additional time for Student to complete the assignment. The class could not stop and wait for Student. Similarly, Student could not continue to work on an assignment when the remainder of the class moved onto a different subject or task. Mother's and Ms. Bunt's insistence that Student complete every class assignment demonstrated a lack of practical insight regarding the demands of the Student's general education classroom environment. (Factual Findings 173, 228.)

48.     Ms. Bunt stated that an aide who works as a one-on-one with an autistic child in the classroom needed to possess a bachelor degree, as well as be certified (BCBA) by the Behavior Analyst Certification Board (BACB). A BCBA is a relatively new certification and has exclusive and rigorous demands. BCBA's are trained in ABA, which is the primary, if not only, behavior methodology of BACB. She asserted that Ms. Reymundo was undertrained and not qualified. Ms. Bunt never observed Ms. Reymundo work with Student in class. Further, there is no legal requirement that personnel who work with students on behavior goals possess a BCBA. (Factual Findings 151.)

49.     Ms. Reymundo had 12 years of experience working with special needs children. She had been a special education assistant in the District since 2000 and had attended District workshops on working with students with disabilities at least once a year since she became SE assistant. Ms. LeFleur, Ms. Somilleda, and BST assistant Mr. Montanez provided regular training and modeling of behavior intervention strategies. She was supervised by the BID's, who devised the behavior intervention strategies. Ms. LeFleur and Ms. Somilleda credibly testified that Ms. Reymundo learned and faithfully implemented the strategies. (Factual Findings 165-174.)

50.     Ms. Somilleda gave her professional opinion that Student's behaviors did not require a full-time, one-on-one BCBA aide. The FBA clearly identified the targeted behaviors and the qualitative data indicated what strategies would successfully address the behaviors. Ms. Somilleda emphasized that all behavior intervention was based on qualitative data. She described how the data was gathered in timed periods, over several hours. Ms. Somilleda described her training of Ms. Reymundo, in data acquisition, using a stopwatch. She checked Ms. Reymundo's accuracy by simultaneously gathering and comparing data.

Ms. Somilleda charted and analyzed the data every two weeks, regularly evaluating behavior interventions. She shared these charts at meetings with Mother. Ms. Bunt was invited to these meetings but never participated, further undermining the persuasiveness of her testimony.[13] (Factual Findings 196-204.)

51.     Student did not challenge District's findings that Student had cognitive and processing weaknesses, which could not be addressed by behavior intervention alone. Ms. Choe, Ms. Peña-Rivera, Ms. Somilleda, and Ms. Dennis all expressed concern that Mother and her advisors did not properly consider Student's need for special education teaching to access curriculum. At the April 12, 2011 amendment IEP, Ms. Choe and Ms. Peña-Rivera both stated that Student required the services of a special education teacher and that the general education classroom's academic demands and pace overwhelmed Student, causing frustration and anxiety, with increased inappropriate behaviors. (Factual Findings 141-153.)

52.     Ms. Bunt's testimony did not properly consider Student's processing weaknesses or explain how behavior intervention alone would meet Student's SE education needs, especially when the performance challenges of the general education classroom triggered much of the behavior. In contrast, the evidence showed that based upon qualitative data, the District devised behavior intervention strategies, which responsible and qualified personnel taught Ms. Reymundo. Ms. Reymundo was properly supervised and dependably learned and implemented the strategies. The evidence does not support a finding that the aide needed to be a BCBA or apply only one behavior intervention methodology preferred by Student's Parents. Student has failed to demonstrate by a preponderance of the evidence that Ms. Reymundo was not qualified to be Student's BII aide and, thus, had denied Student a FAPE. (Factual Findings 6-232; Legal Conclusions 1-51.)

*Issues Two and Nine: District Was Not Required to Provide Transportation*

53.     In Issues Two and Nine, Student contends she was denied a FAPE in the 2010-2011 and 2011-2012 regular school years because District did not offer transportation from her home to her home school, which was four blocks away. In Issue Two, Student further contends that she was denied a FAPE in the 2010-2011 school year because District interfered with her right to participate in the IEP development process on this issue. District contends that Student's disability did not prohibit her from getting to school in the same manner as her non-disable peers. Further, District thoroughly explained the basis for its denial of transportation. Mother was not denied a right to participate in the IEP.

54.     Legal Conclusions 1 to 51, are incorporated by reference.

---

[13] These charts were based on qualitative data collection. The daily behavior logs, completed on a form for Mother, were narratives, not qualitative data, and not used to evaluate behavior intervention strategies. Ms. Bunt never said she reviewed the qualitative data.

55.     Title 34 Code of Federal Regulations, part 300.34 defines transportation as a related service, and stresses that transportation is one element in determining a FAPE for a student with disabilities.  A school district must provide a related service only if a student with a disability requires it to benefit from student's special education.  (20 U.S.C § 1401(26)(A); 34 C.F.R. § 300.34(a); Ed. Code § 56363, subdivision (a.).)  In accordance with Education Code, section 56195.8 (b)(5), the District's policy must set forth criteria for meeting the transportation needs of special education pupils.

56.     In matters alleging procedural violations, the denial of a FAPE may only be shown if the procedural violations impeded the child's right to a FAPE, significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE, or caused a deprivation of educational benefits.  (Ed. Code, § 56505, subd. (f)(2); see also *W.G. v. Board of Trustees of Target Range School District No. 23* (9th Cir. 1992) 960 F.2d 1479, 1484.)

57.     Student has failed to meet her burden of proof by a preponderance of the evidence that the District wrongfully denied transportation to Student, as well as procedurally impeding Mother's right to participate in the IEP regarding transportation.  The District considered the reasons for Mother's request and thoroughly explained the basis for its denial of transportation.  Mother was not denied a right to participate in the IEP.

58.     District developed special education transportation guidelines for use by IEP teams that clarify when special education services are required.  (See Ed. Code, § 41851.2)  The District's *Special Education Policies and Procedures Manual* outlined the District's overall procedures.  District Bulletin 5003.3 provided additional guidance to IEP teams regarding transportation.

59.     The District's policy was that students with disabilities attending their school of residence are expected to transport themselves either with the assistance of family and community members, or with siblings, peers and other students in the neighborhood who attend the same school.  This was the least restrictive option for students with disabilities and applied to students from pre-school through the age of 22.  The related service of transportation for a student with a disability is to address student's educational needs, not to accommodate a parent's convenience, preference, or need for child care.

60.     The District's guidelines state that transportation was provided as a related service for students with disabilities in two scenarios.  The first was if a student was placed by the District at a school other than their school of residence.  Heliotrope was Student's home school.  When the District offered ESY for Student, the District provided transportation because the ESY class was held on a campus other that Heliotrope.  Ms. Choe testified that this was explained in the IEP.  The transportation was from Student's home school to the ESY school site, not from the Student's home.  Mother accepted the ESY with transportation.

61.     The second scenario when District would provide transportation as a related service was when a student's disability prohibits them from getting to school in the same manner as their non-disabled peers. District correctly determined that Student's disability did not prevent her from getting to school like her non-disabled peers. To the extent Student engaged in self-injurious behavior, it was sporadic, and manifested as tantrums, falling to ground, and/or hitting her head on her lap. Student presented no evidence that these sporadic behaviors were so severe that Student could not walk or be driven the four blocks from home to school.

62.     Student argues that her tendency to flee is a consequence of her disability, and she could therefore not walk herself to school. However, the test is whether Student could get to school like her non-disabled peers, not if she could walk alone. The evidence did not support a conclusion that Student was a constant elopement risk. Student was seven and eight years old during the timeframe in question. An adult or older student would typically accompany a similarly aged non-disabled peer if walking to school and, if the child had a tendency to take off, the person would hold the child's hand. Similarly, if walking, someone could hold Student's hand. Student's disability did not require transportation in order to access her special education.

63.     Ms. Peña-Rivera conducted a thorough psychoeducational evaluation and an FBA of Student. She persuasively testified that Student did not require transportation. The District considered Mother's request and Student's unique needs. District made an informed decision that Student did not require transportation as a related service to access her special education because Student's disability did not prohibit her getting to school in the same manner as her non-disabled peers. Accordingly, Student did not demonstrate she was denied a FAPE on this ground, as alleged in Issues Two and Nine. (Factual Findings 108-188; Legal Conclusions 1-62.)

64.     Student also asserts that District impeded Mother's right to participate in the IEP process regarding transportation. This would be a procedural violation which, in and of itself, would not automatically result in a denial of FAPE. However, Student has not met her burden of proof by demonstrating that Mother was denied an opportunity to participate in the discussion regarding transportation. Mother testified that she stated her reasons for the request in the IEP. Also attending the IEPs were Father, advocates, Ms. Bunt and Ms. Patin. They discussed, or had the opportunity to further discuss, the transportation request. Ms. Choe affirmed that transportation was both discussed and explained. District's denial of transportation did not mean District ignored Mother or her concerns. Student did not meet her burden of proof by a preponderance of the evidence that District in any way impeded Mother or her representatives from participating regarding transportation, and for this reason, Student's Issue Two claim also fails. (Factual Findings 6-232; Legal Conclusions 1-64.)

*Issue Three:   No FAPE Denial from September 2010 through November 2010*

65.     In Issue Three, Student contends District denied her a FAPE from September 2010 through November 2010 by not providing her with the services and goals from the

60

2006 IEP and/or an adult aide and transportation. In a related contention, Student contends Parent's procedural rights were violated because the District authorized services for Student without an IEP meeting, during the time Student's assessments were underway and an IEP was being developed. District contends that it could not make an offer of placement and related services without reliable assessments and that the general classroom placement and an aide was to accommodate Mother's requests and concerns until the timely completion of the assessments.

66.    Legal Conclusions 1 to 64, are incorporated by reference.

67.    Student has failed to meet her burden of proof on this issue. This issue was discussed above in addressing Issue One. (See Legal Conclusions 22-25, above.) The District reasonably and properly determined that the provision of the 2006 IEP related services, without knowledge of Student's educational history and without recent assessments, would violate its duty to fully assess a student before developing and implementing an IEP. (See Ed. Code, § 56320, subd. (f).) Similarly, District was legally required to obtain current, reliable assessments of Student's present levels of performance to determine Student's special education needs before developing goals and objectives, as well as well as placement and related services.

68.    Mother further argues that the since the October 2010 IEP did not include Student's aide as a related service, she was unable to use the IEP process to address her concerns for Ms. Reymundo. Principal Ms. Avalos explained to Mother's counsel that District provided Student with an aide because Mother was concerned about her safety and behavior. The 2006 IEP did not include a one-on-one aide as a related service because District did not have an assessment indicating the need. Therefore, since the aide was not a related service from a valid, prior IEP, and since District was in the process of developing a new IEP for Student at the time, Mother did not have a right to use the IEP process to address concerns regarding Ms. Reymundo.

69.    Student argues that many of Student's needs were discussed at the October 2010 IEP and, having been informed of the needs, District was required to provide needed related services and goals. Student's assertion contradicts the IDEA mandate that IEP's PLOPS, goals, placement, and related services must be based upon written reports of assessments by qualified persons. At the time of the IEP, District was completing its assessment to which Mother gave consent on September 13, 2010. District completed the assessments, timely convening an IEP on November 9, 2010.

70.    Student has failed to meet her burden of proof on Issue Three. District was not required to develop goals and provide related services at the October 13, 2010 IEP, because it had no assessments of Student's needs. (Factual Findings 6-232; Legal Conclusions 1-69.)

5.    The 45 hours of intensive instruction are compensatory and are not "stay put."

## PREVAILING PARTY

Education Code section 56507, subdivision (d), requires that this Decision indicate the extent to which each party prevailed on each issue heard and decided in this due process matter.  District prevailed on Issues 1 through 10.  Student prevailed on Issue 11.  Student did not receive her requested remedy.

## RIGHT TO APPEAL THIS DECISION

This is a final administrative Decision, and all parties are bound by it.  Pursuant to Education Code section 56506, subdivision (k), any party may appeal this Decision to a court of competent jurisdiction within ninety (90) days of receipt.

DATED: October 10, 2012

_____
/s/
CLIFFORD H. WOOSLEY
Administrative Law Judge
Office of Administrative Hearing

69

*Issues Four, Six, and Eight – No Predetermination*

71.     In Issues Four and Six, Student contends, respectively, that she was denied a FAPE because District predetermined Student's placement at the November 2010 IEP team meeting, and because District predetermined the provision of BID services at the March 2011 IEP team meeting.  In Issue Eight, Student claims that the District administrator, Mr. Eaton, made the District's FAPE offer before the IEP team finished updating the PLOPS and goals at the June 14, 2011, IEP, such that District predetermined its offer.   District contends that it did not predetermine the November 2010 offer of placement, the March 2011 provision of BID, or its placement offer of June 14, 2011.  District asserts that the IEP team fully discussed placement and BID, including other options and provisions.  As discussed below, Student has failed to meet her burden of proving by the preponderance of the evidence that District predetermined Student's placement, BID, or FAPE offers at any of these IEP team meetings.

72.     Legal Conclusions 1 to 70, are incorporated by reference.

73.     Predetermination of a student's placement is a procedural violation that deprives a student of a FAPE in those instances in which placement is determined without parental involvement in developing the IEP.  (*Deal v. Hamilton County Bd. of Educ.* (6th Cir. 2004) 392 F.3d 840, 859.)  To fulfill the goal of parental participation in the IEP process, the school district is required to conduct a meaningful IEP meeting.  (*Target Range, supra,* 960 F.2d at p. 1485.)  A parent has meaningfully participated in the development of an IEP when she is informed of her child's problems, attends the IEP meeting, expresses her disagreement regarding the IEP team's conclusion, and requests revisions in the IEP.  (*N.L. v. Knox County Schs.* (6th Cir. 2003) 315 F.3d 681, 693; *Fuhrmann v. East Hanover Bd. Of Educ.* (3d Cir. 1993) 933 F.2d 1031, 1036.)  "A school district violates IDEA procedures if it independently develops an IEP, without meaningful parental participation, and then simply presents the IEP to the parent for ratification." (*Ms. S. ex rel G. v. Vashon Island School District, supra,* 337 F.3d 1115, 1131.)  However, an IEP need not conform to a parent's wishes in order to be sufficient or appropriate.  (*Shaw v. Distr. of Columbia* (D.D.C. 2002) 238 F.Supp.2d 127, 139 [IDEA does not provide for an "education . . . designed according to the parent's desires."].)

74.     As to Issue Four, the evidence did not show that District predetermined placement.  Mother attended the November 9, 2010 IEP with Father, as well as SELF advocates J. Wiley Campbell, and Jim Campbell.  The IEP transcript confirms a very active IEP team, with Mother and advocates asking questions of Ms. Peña-Rivera throughout her presentation of the psychoeducational report, which recommended an SDC placement.  When Ms. Choe, later in the meeting, made a SDC placement recommendation, Mother's advocates started to discuss the SDC placement.  The transcript reflects questions, discussion, and suggestions regarding placement, including the possibility of home school.  The transcript also indicates that it was Mother's advocates who changed the subject from a conversation about placement to ESY.  The District did not cut off or discourage discussion

of the placement recommendation or options; no evidence was presented showing the District came to the meeting with a "take it or leave it" offer. The fact that the District disagreed with Mother and her advocates about the most appropriate placement does not indicate that Mother was deprived "of meaningful parental participation." A District is not required to offer placement that the parent prefers but, instead, considers the parent's concerns and offers the placement and related services which provide a FAPE in the LRE. The record and evidence convincingly prove that the District did not predetermine Student's placement at the November 2010 IEP. Student has failed to meet her burden of proof on Issue Four. (Factual Findings 80-112; Legal Conclusions 1-73.)

75.     As to Issue Six, Student did not provide persuasive evidence that District predetermined the amount of BID hours it would offer at the March 2011 IEP team meeting. Ms. Peña-Rivera presented her FBA and the IEP transcript reflects a very active IEP team, including Mother, Wiley Campbell, Jim Campbell, and Ms. Bunt. Mother's advocates asked for a nonpublic agency to provide the BID and for a substantial increase in BID training of the BII, suggesting about 20 hours a week. The transcript reflects a discussion regarding the request, but the District indicated that its staff was qualified to provide the BID. Ms. Valles discussed how the offer included an SDC placement and that the special education teacher and special education adult aides were highly trained staff which would further provide the support and guidance for Student's BII needs. Ms. Choe offered to bring in a District autism expert. Mr. Campbell asked District to provide 10 hours of BID a week. Ms. Choe testified that she was informed by the behavior support team (BST) of the amount of BID hours that would support the contemplated BII. Since the BID had just been offered, no BID provider was at the IEP. Ms. Choe was unable to unilaterally substantially change the BID hours without discussing the matter with BST, which provided the BID. During the IEP, the team discussed Mother's request for a nonpublic agency (NPA) BID and for increased hours. During the discussions, the District responded that its BST staff were qualified to provide the BII training. District did not offer a NPA BID; however, Ms. Choe increased the BID hours to 15, with no end date, saying that if the BID requires more hours, that can be provided. [14] The testimony and IEP transcript confirm the District listened to Mother and the advocates and discussed their requests for NPA and more BID hours. The District actually responded, offering more BID hours and an autism specialist. Student fails to meet her burden of proof on Issue Six. (Factual Findings 127-140; Legal Conclusions 1-74.)

76.     As to Issue Eight, Student's argument is that Mother's ability to meaningfully participate was infringed because the IEP team did not first complete the discussion of all PLOPS and goals prior to discussing the offer of placement and services at the June 14, 2011 IEP. Specifically, Student argues that the IEP transcript shows predetermination. District contends that the transcript of the IEP demonstrates a full and fluid discussion regarding District's offer of placement, with no indication of predetermination.

---

[14] The BID Ms. LaFleur provided more BID hours at the April 2011 IEP.

77.     The IEP transcript is 188 pages; the IEP ran about six hours. Student states that Mr. Eaton made an offer of placement to Parent at page 126 of the transcript. (Student Exh. 39, p. 844.) Student says that the IEP team came back from a break later in the meeting and finished the Student's goals. (Trans., p 129; Student Exh. 39, p. 847.) The team finished the PLOPS five pages later. (Trans., p 134; Student Exh. 39, p. 852.) According to Student's logic, since the District made its placement offer before the goals and PLOPS were finished, the District predetermined placement.

78.     However, the transcript does not support this contention. The team started to discuss placement at page 114 of the transcript (Student Exh. 39, p. 931) following a long discussion of a behavior goal. This is approximately four hours into the meeting. Ms. LaFleur indicated that she needed to leave in a little more than a half hour. Ms. Peña-Rivera asked if it would be a good time to discuss placement, while Ms. LaFleur was still present. No one objected, so Mr. Eaton, Ms. LaFleur, Ms. Peña-Rivera, Jim Campbell, and Mother started to discuss placement. The discussion included various options of SDC, RSP pullout, partial inclusion, the difference between SE and GE teachers, and NPS. Eventually, the District made its offer, allowing more discussion before Ms. LaFleur needed to leave. The record reflects a lengthy and fluid discussion where Mother and her advocate posed questions and made suggestions about placement. The District explained its belief that Student required special education teaching and then discussed various and flexible placements, which could meet Student's need. Nothing in this discussion was sudden and autocratic, having started with everyone's permission. If Mother or her advocate believed the PLOPS and goals had to be completed before having a placement discussion, they were invited to say so; they did not. Notably, Student's contention in Issue Eight was limited to whether there was a procedural violation of predetermination as evidenced by the District giving its placement offer before completion of the PLOPS and goals. The IEP transcript does not support the contention. Student has failed to meet her burden of proof for Issue Eight. District did not predetermine its FAPE offer at the June 14, 2011. (Factual Findings 179-192; Legal Conclusions 1-77.)

*Issue Ten: Assessment Plan Following February 2012 IEP*

79.     In Issue Ten, Student contends she was denied a FAPE because District did not timely provide an assessment plan, as it stated it would, at the February 28, 2012 IEP team meeting. Specifically, at the February 28, 2012 IEP meeting, Mother's advocate requested that Student be placed in an NPS for high functioning autistic children. District said that it needed to conduct an assessment report before District could respond and promised to provide an assessment plan. Student claims that she was deprived of a FAPE because District did not timely provide an assessment plan within 15 days. District contends the 15-day timeline was inapplicable.

80.     Legal Conclusions 1 to 78, are incorporated by reference.

81.     A school district must develop an assessment plan within 15 days of a "referral for assessment." (Ed. Code, §§ 56321, subd. (a); 56043, subd. (a).) A "referral for

64

assessment" is defined as "any written request for assessment to identify an individual with exceptional needs" made by a student's parent or guardian, a student's teacher or other service provider, or a student's foster parent. (Ed Code, § 56029.) The school district or local educational agency is required to conduct an assessment and convene an IEP meeting within 60 days of receiving parental consent to assessment. (20 U.S.C. § 1414(a)(C)(I); 34 C.F.R. § 300.303; Ed. Code, § 56344.)

82.    A school district's failure to conduct appropriate assessments or to assess in all areas of suspected disability may constitute a procedural denial of a FAPE. (*Park v. Anaheim Union High School District, et al.* (9th Cir. 2006) 464 F.3d 1025, 1031-1033.)

83.    Here, the District indicated it would provide an assessment plan enabling it to give an informed response to Mother' request for an NPS placement. Therefore, there was no "referral for assessment" because no one requested that Student be assessed in writing to identify Student as an individual with exceptional needs. Simply put, the 15-day timeline was inapplicable, such that Student's contention fails on that ground. Further, the evidence that Mother's attorneys received the proposed assessment plan on April 17, 2012. Although Mother testified that she did not consent to the assessment plan because in her opinion, the assessment could not be completed by the end of the school year, Mother's opinion was not supported by any other evidence. There was ample time to assess Student and reconvene the IEP team prior to the next school year. Accordingly, Student has failed to meet her burden of proof by a preponderance of evidence on Issue Ten, that District's delay in providing an assessment plan denied Student a FAPE. (Factual Findings 211-221; Legal Conclusions 1-82.)

*Issue 11:    Prior Written Notice In Response To Mother's Request For An NPS at the February 2012 IEP*

84.    In Issue Eleven, Student contends she was denied a FAPE between February 28, 2012, the date Student requested an NPS placement at an IEP team meeting, and May 29, 2012, the date of filing, because District failed to provide prior written notice of District's position regarding Student's request. District contends it did not violate the procedural requirements of the IDEA because it could not make a decision without an assessment. District provided Mother's attorneys with an assessment plan, but Mother did not consent and the District consequently could not make an informed decision regarding Mother's NPS request.

85.    Legal Conclusions 1 to 83, are incorporated by reference.

86.    School districts are required to provide parents with prior written notice whenever they propose or refuse to initiate or change the identification, evaluation, or educational placement of the student or the provision of FAPE to the student. (34 C. F. R. §300.503; Ed. Code, § 56500.4, subd. (a).)

87. Student has met her burden of proof in establishing, by a preponderance of the evidence, that District denied Student a FAPE by failing to provide prior written notice in response to Mother's request for an NPS at the February 2012 IEP meeting. During the meeting, the District responded by offering to conduct an assessment so District could make an informed response to the NPS request.

88. District argues that it neither proposed nor denied a change in placement. It reserved its decision until after a comprehensive assessment. Mother later refused to sign the assessment, which was provided on April 17, 2012, such that District contends it never actually decided whether to grant or deny the request for an NPS. Thus, District asserts it was not required to provide prior written notice.

89. District's argument is disingenuous. The District cannot avoid its responsibility to inform Mother within a reasonable time of whether it intended to grant her request for change in placement. District's argument is even less persuasive when one considers that it did not answer Mother's request at the IEP. Therefore, the IEP cannot be considered to have provided a clear response in place of a prior written notice.

90. Though the six-week wait in sending the assessment plan may not have violated the 15-day timeline, it did evidence an inexplicable delay in responding to Mother's request for a change in placement. District did not provide a prior written notice before the due process filing of May 29, 2012. The evidence indicated that Student's behavior deteriorated over the last few months of the third grade, with increased aggression and off task behaviors. Even if District correctly contended that Student should not have been in the general education classroom, Mother was still entitled to know if District would agree to a change in placement. The failure to provide a reasonably timely written notice in response to Mother's request for an NPS placement significantly impeded Mother's opportunity to participate in the decision-making process regarding the provision of FAPE. Student has met her burden of proof as to Issue 11. (Factual Findings 211-227; Legal Conclusions 1-89.)

*Remedy*

91. Student is not entitled to a remedy on Issues 1 through 10, because she did not demonstrate that she was denied a FAPE on those grounds. However, Student prevailed on Issue 11, for which she seeks placement in a NPS, preferably the Help Group.

92. Federal law provides that a court that hears a civil action taken from a special education administrative due process hearing "shall grant such relief as the court deems appropriate." (20 U.S.C. § 1415(i)(2)(C)(iii); 34 C.F.R. § 300.516(c)(3)(2006).) The United States Supreme Court has held that this authority "confers broad discretion on the court" to grant relief that is appropriate in light of the purpose of the IDEA. (*School Committee of the Town of Burlington, Massachusetts v. Department of Education* (1985) 471 U.S. 359, 369 [105 S.Ct. 1996, 85 L.Ed.2d 385].) The broad authority to grant relief extends to the administrative law judges and hearing officers who preside at administrative special

66

education due process proceedings. (*Forest Grove School District v. T.A.* (2009) 557 U.S. 230 [129 S.Ct. 2484, 2494, fn. 11; 174 L.Ed.2d 168].)

93.     The fashioning of equitable relief in IDEA cases requires a "fact-specific" analysis. (*Parents of Student W. v. Puyallup School District No.* (9th Cir. 1994) 31 F.3d. 1489, 1497.) School districts may be ordered to provide compensatory education or additional services to a student who has been denied a FAPE. (*Id.* at p. 1496.) The conduct of both parties must be reviewed and considered to determine whether relief is appropriate. (*Ibid.*) These are equitable remedies that courts may employ to craft "appropriate relief" for a party. An award of compensatory education need not provide a "day-for-day compensation." (*Id.* at p. 1497.) An award to compensate for past violations must rely on an individualized assessment, just as an IEP focuses on the individual student's needs. (*Reid ex rel. Reid v. District of Columbia* (D.D.C. Cir. 2005) 401 F.3d 516, 524 (*Reid*).) The award must be "reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." (*Ibid.*)

94.     District should have been able to inform Mother of its decision, or request consent on an assessment plan, within two weeks after the February 28, 2012 IEP. So a reasonable time for District to have provided prior written notice was, roughly, March 15, 2012. Therefore, from March 15 to May 29, 2012 (10 weeks), District was not in procedural compliance. For one week, District schools were closed for spring break.

95.     Both Mother and Ms. Bunt testified that the Help Group would be an appropriate placement for Student because of its program for high performing, autistic children, which utilizes behavior intervention which would address Student's behaviors while enabling Student to access her academics.

96.     Other than the testimony of Ms. Bunt and the expressed desires of Mother, Student presented no evidence that Student would benefit from the program at Help Group, or any other NPS placement. No document or testimony signified that the Help Group would provide services that met the Student's special educational needs as determined by the assessments, evaluations, and IEP's of the prior 16 months. This is especially significant when the requested remedy would result in Student moving from a LRE of general education curriculum and classroom, to an NPS, which is considered a more restrictive placement.

97.     For this reason, no "fact specific" analysis can support Student's request for an NPS placement. As the legal conclusions found, the District's consistent recommendation of special education teaching, by way of SDC placement or RSP, was well founded. The record supports a general finding that Student's legal counsel and experts unduly focused on her behavior, while they largely ignored Student's need for special education teaching. The record convincingly indicates that Student's classroom behaviors were aggravated by her inability to process the general education curriculum within the demanding general education classroom. District offered a continuum of special education teaching and general education mainstreaming. Yet, Student remained in a general education classroom, with no special

education teaching, because of the "cherry picking" of related services from the District's FAPE sufficient offers. The process ignored the in-depth assessments that demonstrated Student's special education needs, rendering Student a disservice.

98.     In fashioning a remedy, the conduct of both parties must be reviewed and considered to determine whether relief is appropriate. These are equitable remedies that courts may employ to craft "appropriate relief" for a party. The tactics used by counsel and advocates on behalf of Mother and Student introduced a gamesmanship into the evaluative and IEP process, inconsistent with the IDEA policy goals of collaboration and consensus. One of the advocates actually stated in an IEP that they never allow the parents to sign IEPs. (Student Exh. 39, p. 894.) Though District failed to provide a timely prior written notice following the February 2012 IEP, Mother's counsel could have contacted District and inquired about the status. Instead, the evidence indicates a waiting game, more intent on seeing the District stumble into a violation than obtaining an educational placement and services that would benefit Student.

99.     At the February 2012 IEP, Ms. Dennis discussed a number of different options, from SDC class, with general education mainstreaming in non-core subjects, to RSP support if Student remained in a general education classroom. In her February 20, 2012 observation report, the inclusion specialist's recommendations included intensive instruction for Student in language arts by a special education teacher. (Factual Findings 214.) Further, the assessments, evaluations, and credible hearing testimony, indicate that Student would benefit from intensive instruction in language arts. An hour a day of such RSP would have been a reasonable support for Student during the remainder of her third grade.

100.     Accordingly, given that Student was in school for nine weeks during which District was not in procedural compliance, Student is awarded 45 hours (five hours per week multiplied by nine weeks) of intensive instruction in language arts by a special education teacher. These hours are compensatory. The hours must be used within 14 months of the date of issuance of this decision, at which time unused hours will be forfeited. (Factual Findings 1-232; Legal Conclusions 1-99.)

## ORDER

1.     Student's claims for relief on Issues 1 through 10 are denied.

2.     Student's claim for relief on Issue 11 is granted, as set forth below.

3.     District shall provide a credentialed, special education teacher to deliver 45 hours of intensive instruction to Student in language arts.

4.     Student has 14 months from the date of this decision to use the 45 hours of intensive instruction. Any unused hours remaining at the end of the 14 months shall be forfeited.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Manuel Real and the assigned discovery Magistrate Judge is Victor B. Kenton.

The case number on all documents filed with the Court should read as follows:

## CV12- 9924 R (VBKx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

Unless otherwise ordered, the United States District Judge assigned to this case will hear and determine all discovery related motions.

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division** | [ ] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)     NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

Jennifer Guze Campbell (SBN 86818)
Vanessa Jarvis (SBN 201585)
Special Education Law Firm, APC
5206 Montair Avenue
Lakewood, CA  90712

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| I.R., a minor, by her Mother, E.N. | **CASE NUMBER** |
| PLAINTIFF(S) | **CV 12 9924** ← R (VBKx) |
| v. | |
| LOS ANGELES UNIFIED SCHOOL DISTRICT | **SUMMONS** |
| DEFENDANT(S). | |

TO:  DEFENDANT(S): <u>Los Angeles Unified School District</u>

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, <u>JENNIFER GUZE CAMPBELL</u>_____, whose address is <u>Special Education Law Firm, APC, 5206 Montair Avenue, Lakewood, CA 90712</u>_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.   You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated:  NOV 2 7 2012 _____

By:  MARILYN DAVIS _____
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

Jennifer Guze Campbell (SBN 86818)
Vanessa Jarvis (SBN 201585)
Special Education Law Firm, APC
5206 Montair Avenue
Lakewood, CA 90712

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| I.R., a minor, by her Mother, E.N. | CASE NUMBER |
|---|---|
| PLAINTIFF(S) | **CV 12 9924 - R (VBK)** |
| v. | |
| LOS ANGELES UNIFIED SCHOOL DISTRICT | **SUMMONS** |
| DEFENDANT(S). | |

TO:  DEFENDANT(S): Los Angeles Unified School District

   A lawsuit has been filed against you.

   Within __21__ days after service of this summons on you (not counting the day you received it), you
must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint
☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer
or motion must be served on the plaintiff's attorney, JENNIFER GUZE CAMPBELL_____, whose address is
Special Education Law Firm, APC, 5206 Montair Avenue, Lakewood, CA 90712_____.  If you fail to do so,
judgment by default will be entered against you for the relief demanded in the complaint.  You also must file
your answer or motion with the court.

                                        Clerk, U.S. District Court

Dated: ___NOV 2 7 2012___          By: _____
                                              Deputy Clerk

                                              *(Seal of the Court)*


*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed
60 days by Rule 12(a)(3)].*

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| I.R., a minor, by her Mother, E.N. | Los Angeles Unified School District |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| JENNIFER GUZE CAMPBELL (SBN 86818),VANESSA JARVIS (SBN 201585),Special Education Law Firm, APC,5206 Montair Avenue, Lakewood, CA 90712, Telephone: (562)735-4111, Facsimile (562)490-8663 | Patrick Balucan, Attorney Los Angeles Unified School District, 333 S Beaudry Avenue, 20th Floor, Los Angeles, CA 90017, Telephone: (213)241-7648, Facsimile: (213)241-3311 |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☐ Yes ☑ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☑ No   ☑ MONEY DEMANDED IN COMPLAINT: $ To be determined

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
20 USC §1415(i)(2)(A) and 20 USC §1415 §(i)(2)(C)   Denial of a free appropriate public education in the least restrictive environment.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco- mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☑ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | IMMIGRATION | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| | REAL PROPERTY | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus- Alien Detainee | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:**   Case Number: **CV12 9924**

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No  ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No  ☐ Yes
If yes, list case number(s): _____

*Civil cases are deemed related if a previously filed case and the present case:*
(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or
                               ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
                               ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
                               ☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐  Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐  Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
  Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR PRO PER):** _Quinza Ruiz Campbell_   Date _November 14, 2012_

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969 (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |